OLINDA V. ADAMS, MARY V. SWAIN, ROSALIND Z. ADAMS and GENEVIEVE LESTER, Appellants, v. JAMES H. GOSSOM, ALVINA T. GOSSOM and DOE RUN LEAD COMPANY.

Division One, May 31, 1910.

1. AMENDED ABSTRACT: Nunc Pro Tunc Entry. Where the original abstract showed no record entry of the filing of a bill of exceptions, and respondent's counter abstract showed no entry was made, and leave was granted appellant to apply to the trial court for such *nunc pro tunc* order, and such application was made and granted on sufficient data, and the supplied entry has been brought up by an additional abstract by appellant, the exceptions will be reviewed.

2. TAX DEED: Suit Against Deceased Owner. A tax deed, executed by a sheriff under a judgment rendered against a deceased person, does not convey the title of his heirs, even though he had for years been the owner and the taxes were assessed against him after his death.

3. ———: ———: Limitations: Equitable Title. Adverse possession of land for the statutory period of limitations, under a deed and a claim of ownership, although the deed is not recorded, and the grantee therein held only an equitable title,

since the possessor paid the consideration, not only bars a recovery of the land by others, but it confers title on the possessor. So that where James paid for land in 1864, and took a deed to his brother John and thereafter James went into possession and exercised unequivocal dominion and ownership for ten years or more, the title was vested in him. John had only an equitable title, and James having paid the consideration, a resulting trust arose instantly in James's favor, and the fact that the deed was not recorded until after a tax suit brought against James subsequently to his death does not affect the title of his heirs, or give to the purchaser at such tax suit any additional right.

4. ———: **Record Owner: Sale of Interest of Actual Owner: Innocent Purchaser.** Adams acquired title in 1864 from Stay, but deed was not recorded till 1905, and Stay remained apparent record owner, and when tax suit was brought against both, Adams was dead and perhaps Stay also. The judgment, execution and deed named Adams as owner, and conveyed his interest. *Held*, that defendant, who was the purchaser at the tax sale, will not be heard to deny that Adams, though his heirs were not in possession at the time, was the actual owner, for his own muniments of title all proclaimed to him that he was, and put him on inquiry to ascertain the fact. His plea of innocent purchaser will not, therefore, avail.

5. ———: **Quieting Title: Former Suit.** A former suit by defendant to quiet title, to which plaintiffs were not made a party, is no bar to their subsequent suit.

6. ———: **Tender of Taxes.** The Act of 1903, Laws 1903, p. 254, requiring the tender by plaintiff of taxes paid by defendant as the price of plaintiff's recovery against a tax deed, does not apply to tax sales made prior to its passage.

Appeal from St. Francois Circuit Court. — *Hon. Charles A. Killian*, Judge.

REVERSED AND REMANDED (*with directions*).

*Thomas L. Anderson* and *Henry H. Oberschelp* for appellants.

(1) Although the deed named John B. Adams as the grantee, when this property was purchased in 1864 from Joseph Stay, yet the absolute equitable title vested at once in James F. Adams, plaintiffs' hus-

band and father, because he was the man who bought the property. He bought it with his own money and his brother had nothing to do with the affair. Bank v. Fife, 95 Mo. 128; Richardson v. Champion, 143 Mo. 543; Bispham's Principles of Equity (5 Ed.), p. 133, sec. 79. (2) Regardless of what was the nature of the interest as first acquired, the absolute legal title by reason of adverse possession for the statutory period, had vested in said James F. Adams and his heirs, these plaintiffs. R. S. 1899, sec. 4262; Bank v. Fife, 95 Mo. 126; Watt v. Donnell, 80 Mo. 198. (3) This title by adverse possession covered the entire one hundred and twenty acres. R. S. 1899, sec. 4266; Plaster v. Gabreel, 160 Mo. 674; Rannells v. Rannells, 52 Mo. 108; Hughes v. Israel, 73 Mo. 538. (4) This title acquired by adverse possession for the statutory period is in every way as good for purposes of attack or defense as a title by deeds running back to the Government. Scannel v. Soda Fountain Co., 161 Mo. 618; Kirton v. Bull, 168 Mo. 633. The law requires the tax suit to be brought against the real owner. R. S. 1899, sec. 9303; Watt v. Donnell, 80 Mo. 195; Stuart v. Ramsey, 196 Mo. 404. (6) As James F. Adams was dead at the time of the bringing of the tax suit, the judgment was void and the sale under the execution conveyed no title whatever. Perkinson v. Meredith, 158 Mo. 457; Gage v. Cantwell, 191 Mo. 698. (7) Defendants tried to sustain their defense on the contention that Joseph Stay was the record owner, and that there was no notice as to who were the real owners. But that position is not tenable, because there was ample notice that James F. Adams had become the owner. (a) Any facts and circumstances coming to his knowledge that would put a man of ordinary circumspection on inquiry will suffice as actual notice. Stuart v. Ramsey, 196 Mo. 415. (b) Defendant was conscious of means of ascertaining the ownership and did not use them as an ordinarily prudent and diligent

purchaser would have done and is therefore regarded as having had actual knowledge. Taafe v. Kelley, 110 Mo. 127; Memphis Assn. v. Arnett, 169 Mo. 212. (c) The long continued, open and notorious possession of the land by James F. Adams and his heirs stands for notice. St. Joseph v. Baker, 86 Mo. App. 310; Vance v. Corrigan, 78 Mo. 95; Watt v. Donnell, 80 Mo. 198. (d) The defendant Gossom, purchaser at the tax sale, and the other defendants through him, are charged with notice of everything contained or recited in the recorded deeds which constitute the chain of title under which they hold, and the very deed by which he acquired the title, the sheriff's deed, informed him of James F. Adams' ownership of the property. McDonald v. Quick, 139 Mo. 498; Patterson v. Booth, 104 Mo. 402; Mason v. Black, 87 Mo. 329. (e) As the collector had information sufficient to put him on inquiry as to who the real owner was, it was necessary to bring the suit for back taxes against the real owner and not the record owner. Joseph v. Baker, 86 Mo. App. 310; Stuart v. Ramsey, 196 Mo. 415. (8) Notice of the real owner was immaterial in this case, or, rather, was conclusively presumed against the defendants, because the very deed by which defendants claim their title, the sheriff's deed, and also all the proceedings on which that deed was based, solemnly adjudged and declared James F. Adams owner. McDonald v. Quick, 139 Mo. 498; Patterson v. Booth, 104 Mo. 402; Mason v. Black, 87 Mo. 329. (9) Even if Joseph Stay were the record owner, and even if the tax proceedings were regular as to Joseph Stay, yet defendant could have gotten no greater interest than if he had purchased the property directly from Stay. That interest would have been nothing, because the absolute title by adverse possession for the statutory period had been acquired by James F. Adams and his heirs, these plaintiffs, which cuts off all interests of the record owner and those claiming by, through or under him, irrespective of how

the title by adverse possession arose.  Vance v. Corrigan, 78 Mo. 97; St. Joseph v. Baker, 86 Mo. App. 316; Watt v. Donnell, 80 Mo. 198.

*Jere S. Gossom* for respondents.

Section 3150, R. S. 1899, provides that the parties named in the deed shall be presumed to be the owners, and Stay, one of the parties sued, was the record owner, and the judgment was certainly valid as to him and, therefore, passed the title.  Lucas v. Land & Cattle Co., 186 Mo. 456; Schnitger v. Rankin, 192 Mo. 35; Land & Mining Co. v. Land & Cattle Co., 187 Mo. 421; Wilcox v. Phillips, 199 Mo. 288.  A careful perusal of the record will show that the tax purchaser had no notice whatever of the claim of John B. Adams, or that of plaintiffs.  The court found against them on the question of limitation, on any title that they might have thought they had by virtue of their possession, because it is clear that they were not holding adversely to the world; then they bought ten years after the tax sale, and recorded, at the same time the unrecorded deed to John B. Adams was recorded, a deed from the heirs of John B. Adams.  Stuart v. Ramsey, 196 Mo. 404.

LAMM, P. J.—James F. Adams died in 1878 leaving a widow, Genevieve (intermarried with Lester), and three children, Mary (intermarried with Swain), Rosalind and Olinda.  These children and their mother, on August 31, 1905, sued Gossom, his wife and the Doe Run Lead Company to quiet title under section 650, Revised Statutes 1899, in the St. Francois Circuit Court, claiming to own the real estate described in their petition situate in St. Francois county, Missouri, *viz.,* the north half of the southwest quarter and the southwest quarter of the southwest quarter of section 13, township 38, range 5.  There was a second count in ejectment, alleging that defendants were in posses-

sion. Judgment going for defendants, plaintiffs appeal.

Plaintiffs claim title as widow and heirs of James F. Adams and by quitclaim from the heirs of John B. Adams and by adverse possession which, they say, ripened into title as against the whole world. On the other hand the defendant James H. Gossom admits possession in himself and claims title through certain tax proceedings reinforced by a subsequent decree in a suit brought to clear up and perfect the title acquired at the tax sale. The defendant Doe Run Lead Company claims a two-year option to buy Gossom's title on condition that it prove perfect. It alleges by its answer that it was not a proper party to the suit, "has no interest in the title," and asks to be discharged from "further litigation."

In the answer of Gossom and wife it is alleged, *inter alia,* that plaintiffs by long continued silence and failure to assert their claims and give the defendants any notice of it, either actual or constructive, have been guilty of gross negligence and laches and have estopped themselves.

Any other facts necessary to the determination of the case will appear in the body of the opinion.

I. The original abstract made no showing of a record entry of the filing of the bill of exceptions. Respondents filed a counter abstract, showing no entry was made. At a former term we granted leave to appellants to apply *nisi* for such *nunc pro tunc* order, if the data existed warranting it. Acting on the leave, a successful application on that score was made below, and the supplied entry was brought here by an additional abstract by appellants. Respondents make the point that, absent a record entry showing the filing of a bill of exceptions, there are no exceptions to review. But whatever merit at one time in that view is now gone. Sufficient record has been supplied in a way ac-

cording with the practice of the courts. [Ross v. Railroad, 141 Mo. 390; Reed v. Colp, 213 Mo. 1. c. 586 *et seq.*] We rule, therefore, that the case is here on its merits.

II. Plaintiffs' title runs as follows:

(a). A warranty deed from Joseph Stay and wife, of date October 5, 1864, to John B. Adams, conveying the land in dispute, consideration $250, duly acknowledged. This deed was not recorded until *July 3, 1905*, in St. Francois county.

(b). A quitclaim deed, of date April 21, 1905, from the heirs of John B. Adams to appellants, conveying the premises in consideration of one dollar. This deed was recorded in St. Francois county on the same date as *a*, and was acknowledged in Massachusetts where grantors resided.

(c). A warranty deed from William Lambourne and wife to Joseph Stay, recorded on April 30, 1864, acknowledged on May 20, 1862, conveying the premises. Consideration $190.

(d). The record of a patent from the United States government conveying the land to John Nash, dated in 1859, and recorded in 1864.

Oral testimony, practically undisputed, tended to show that John B. Adams resided at Springfield, Massachusetts, and died in 1894, intestate; that his widow is dead; that John B. was a brother of James F. Adams who formerly lived in St. Francois county, Missouri, at Valley Mines; that the grantors in *b* were the only heirs of John B.; that James F. Adams in 1864 lived in North St. Louis; that in that year he bought with his own money the land in dispute from Joseph Stay and took warranty deed *a* in the name of his brother John B.; that James had the money by him ' in his house at the time and it was there paid over to Stay in the presence of witnesses; that from that 'day to this the deed has been in the possession, first of James

and, on his death, of his family; that at that time Stay
was a gray-headed man (over sixty years of age) ; that
James F. Adams moved on the land (then naked and
wild, we infer) in the sixties with his family, put up
buildings, did fencing, planted an orchard, cultivated
fields, and having lived there for over ten years claim-
ing to own it, died on the place and was buried in a
private neighborhood graveyard; that his widow con-
tinued to live there with her three little girls for two
years after her husband died, then moved to St. Louis
in October, 1880, and thereafter for ten years paid
all the taxes. When she moved away she left a tenant
in possession. She was unable to make a living on the
farm with only her little girls to manage it, and moved
back to St. Louis on that account. She collected no
rent and was unable to send any one back to look after
it. There was also testimony tending to show that
John B. Adams never knew the title was taken in his
name or knew of the deed. The children of James F.
Adams, suing here, were born on the farm. There
was some evidence that the widow, in her perplexity,
quit paying taxes, planning thereby to eventually get
a record title in her own name through tax proceed-
ings. Supposing she would be notified of the tax sale
and hearing nothing, she eventually ascertained by
letter that the land had been sold. On that information
in 1903, appellants employed an attorney in St. Louis,
Mr. Pitzer, to recover the land. Mr. Pitzer sought out
the defendant, James H. Gossom, who seems also
to reside in St. Louis. Gossom claimed the land under
a tax sale, and on behalf of appellants Pitzer tendered
him taxes paid and his bid, gave him notice of plain-
tiffs' claim, and that, unless the proposition was ac-
cepted and a quitclaim made, they would sue. Mr.
Gossom said he would consult his attorney and do as
he advised, telling Mr. Pitzer that he, Pitzer, would
hear from him as soon as he heard from his attorney.
Not hearing from Gossom, Mr. Pitzer presently dis-

covered that he had instituted a suit to quiet title. To this suit appellants were not parties. Afterwards appellants filed a bill in equity to set aside the tax sale, but dismissed that and instituted the present proceeding. It appears also that Joseph Stay, grantor in *a,* was traced as a resident of St. Louis until the year of 1867 and then all trace of him was lost. Tax receipts were introduced in evidence from the year 1869 to 1890, inclusive, made out in the name of James F. (or J. F.) Adams. It was also shown that the land was assessed to J. F. Adams from the year 1867 down to and including 1895, and when sold in 1896 for taxes it was still so assessed. A witness, Richardson, also put on by plaintiffs, testified that twenty-eight or thirty years ago he lived close to and knew the Adamses; that at the time Mrs. Adams was living on the land with her husband and family, they had a house, barn, some land cleared up, fencing, some land in cultivation and an orchard, and called the land theirs. They were in possession exercising ownership over it and Mr. Adams claimed to own it. The witness had worked for him and he told witness of improvements he was going to make; that the widow lived there two or three years after Mr. Adams died; that there was nothing on the land now, the house was torn down and carried away and the fences burned. It is not in cultivation now and nobody lives there. The place was always known as the Adams place in the neighborhood.

Defendants put on two witnesses, named Aubuchon, whose testimony agrees with Richardson's in all material points. Both of them testified to the effect that Mr. Adams lived there and claimed to own the land; that after the widow moved away the improvements disappeared and no one now lives there. There was testimony that the land was worth, then and now, about one dollar an acre, barring a prospective mineral value existing then and now.

Plaintiffs also introduced the sheriff's deed under which Gossom claims (presently referred to), and also put in an option contract between defendant James H. Gossom and his co-defendant, the Doe Run Lead Company, bearing date April 15, 1905. But under the pleadings and facts disclosed it will not be necessary to set forth the terms of the option since the Doe Run Lead Company must stand or fall on Gossom's title and defendants do not contend otherwise in their briefs.

The facts relied upon by Gossom to sustain his claim are about as follows:

1. A sheriff's deed acknowledged May 22, 1896, and recorded on June 12, of that year, purporting to convey the title of Joseph Stay and J. F. Adams to James H. Gossom. It recites a tax judgment rendered in November, 1895, against said Stay and Adams for the sum of $15.16 for the taxes for the years 1891 and 1892; that by virtue thereof the sheriff levied upon and seized said real estate, made advertisement of his sale and on May 14th of that year sold to Gossom all of said real estate that he might sell as sheriff by virtue of the aforesaid execution.

2. The sheriff's notice of the execution sale reciting that the sheriff levied upon "all the right, title, claim, interest and estate of the said Joseph Stay and J. F. Adams of, in and to the following described real estate," describing the land in question, and that he would on May 14, 1896, sell at public auction to the highest bidder for cash, all the right, title, claim, etc., of said Joseph Stay and J. F. Adams in and to said described real estate.

3. The petition in the tax suit alleging, among other things, that Joseph Stay and J. F. Adams are the owners of the land. To the petition was appended an affidavit that they were non-residents.

4. The order of publication in the tax suits was directed to Joseph Stay and J. F. Adams, who were notified that unless they appeared at the next term of

court judgment would be rendered against them on the land for certain taxes. This was supplemented by the judgment in the cause reciting that the allegations in the petition are found to be true.

Over the objection of plaintiffs, defendants were permitted to introduce an order of publication at the May term of the St. Francois Circuit Court in 1904, in a suit entitled, "James H. Gossom, plaintiff, v. the Unknown Heirs and Representatives of John Nash, deceased, and the Unknown Heirs and Legal Representatives of Joseph Stay, deceased, and Sarah Stay, his wife, deceased, defendants," and the judgment in said cause. The objection lodged against such record evidence was that these plaintiffs were not parties to that suit. The record at this point shows as follows:

"Defendants' counsel, Mr. Huff, said: 'Of course this couldn't affect them adversely as far as their interest is concerned, but I want to show the extent of this suit to quiet title, want to show whose interests were adjudicated.'

"The court allowed the evidence to show whose interests were adjudicated, to which ruling plaintiffs duly excepted and saved their exceptions."

It will not be necesssary to encumber the opinion with the order of publication or the judgment last referred to. Suffice it to say that the object of the suit was to quiet title. It was on constructive service and appellants were not parties.

The tax attorney, Mr. Pipkin, was called by defendants and testified that he brought the tax suits against the "record owner," that he made Adams a party and may have done so because his name appeared on the tax books. Mr. Turley was collector at the time and testified vaguely that he remembered bringing a suit against some land assessed to Adams. He knew nothing about ownership or the adverse claim of anybody, knew the land was assessed to Adams and used to know Adams but was unable to find anyone to pay the taxes.

The defendant Gossom took the stand in his own behalf, and testified that he knew nothing about Adams' adverse possession of the land, never heard of such a claim. It seems he owned other land in the neighborhood and he authorized a man who lived on this other land to rent the *locus in quo,* or to use it as he saw fit. This man seems to have been general agent to rent and sub-rent all Gossom's land, including the land in suit. Later he put a Mr. Carsteel in possession in the same way, that is, Carsteel lived on adjoining land and supervised all of Gossom's land. The first notice witness had of plaintiffs' claim was from Mr. Pitzer. Witness never knew Adams and up to the time Pitzer talked to him he never knew any such man had a claim on it, did not examine the title at the time he bought at the tax sale, but had an abstract made after the talk with Pitzer and, as his (Pitzer's) clients did not appear on the abstract, witness paid no further attention to it. Witness brought his own suit to quiet title because Nash had never transferred the land. Brought it after Pitzer talked to witness. Witness never lived on the property, but he put his tenants in possession of all of it. Did not know what Mr. Carsteel had done, all the witness did was to pay the taxes. He had received no separate rent for the land in question.

There was no testimony directed to rental values and the court below did not direct its findings to the issues on the second count in ejectment, but found generally for defendants and decreed that plaintiffs take nothing by their suit, that the title was well vested in James H. Gossom in fee simple; that the Doe Run Company had an option from Gossom to purchase the land on the terms prescribed therein.

On such record can the judgment stand? We think not. This because:

(a). The laws of men deal with the quick and not with the dead. On the death of James F. Adams his

heirs and widow took his title by descent cast. At the time of bringing the tax suit, James F. Adams was dead. His heirs and widow could not be sued and precluded vicariously. There was due them, by the law of the land, a day in court. As they were not parties to that proceeding it must be held that the judgment and deed are a nullity both as to Adams, dead, and his heirs, alive.

(b). The next query is, did Adams have title? As between him and his brother John B. it is plain that he held an equitable title from the start. He paid the consideration for the land out of his own pocket and a resulting trust arose *eo instanti* in his favor on that account on the status of facts disclosed on this record. So much is clear law. But this is not all. As against his brother his good title in equity presently united with a good legal title by the Statute of Limitations. He took and held possession under a claim of right, his possession was adverse, open and continuous for more than ten years. It was pronounced and notorious, earmarked by unequivocal acts of domination and ownership in improving the land, thereby fitting it as a home for himself and family. The world knew of his claim and possession and recognized it. The tax officers of St. Francois county knew of it. They assessed the land to him as owner in obedience to the commands of the law requiring assessments to be so made, and these governmental agencies collected tribute from him as owner. Whatever may be the rule in other jurisdictions, in Missouri adverse possession of the character indicated is both a sword and a shield. It not only creates a bar but confers title to real estate. [Kirton v. Bull, 168 Mo. l. c. 633.] "A title acquired by adverse possession under our statute is in every respect as good for purposes of attack or defense, as a title by deeds running back to the Government." See VALLIANT, J., in Scannell v. American Soda Fountain Co., 161 Mo. l. c. 618, and see also cases cited. More-

over plaintiffs reinforced their equitable title and their legal title acquired by the Statute of Limitations with a deed from the heirs of John B. Adams, conveying whatever technical and dry legal title was cast on them at his death. Up to this point, then, we find no difficulty in granting plaintiffs relief because of the mere fact that the deed from Stay to Adams, unrecorded when the tax suit was brought, put the title in John B. Adams instead of James F. Adams.

(c). The proposition just ruled in paragraph *b* relating to the acquisition of the title by adverse possession by James F. Adams, as between him and his brother John, applies equally as well to the acquisition of a title by adverse possession by James F. Adams against Nash, the original entryman and patentee, and his heirs. So far as this record discloses, there was no deed from Nash to Lambourne who conveyed to Stay in 1862. In the view we take of it, James F. Adams acquired title by limitations against Nash.

Furthermore it is self-evident that a possession ripening into title makes the title good as against the whole world as a general proposition. Of course there may be some peculiar features of a given case interrupting or suspending the running of the statute on behalf of some one particular hostile claimant which would make a title by limitations (good as to other claimants) inoperative as to him. But there are no such features in this case. This brings us to the main question which is: Assuming it be settled law that the owner of land may lose it by execution sale because his deed or title is not spread of record, and the tax proceeding is leveled against the apparent record owner, then who has the better title from that point of view? The principles of law determinative of that question center about another, *viz*: Was the purchaser at the tax sale, Gossom, an *innocent purchaser,* that is, was he without

notice of Adams' claim of title? To the consideration of those questions, we pass.

(d). It is contended on behalf of defendants, that the tax suit was properly brought against Stay, the apparent "record owner" and that as to him the judgment was good and conveys a title to Gossom superior to plaintiffs' because, they argue, Gossom had no notice of plaintiffs' claim or title. Attending to this view of the case there was testimony of some value tending to create a presumption that Stay himself was dead at the time the tax suit was begun and constructive service, through newspaper publication, was made. If Stay and Adams were both dead when the tax suit was begun, then Gossom did not get even the title of Stay, the apparent "record owner," through his tax deed. In this connection it will do to say that some years later Mr. Gossom, himself, proceeded on the theory that Stay was dead at the time of the tax suit; for he instituted his suit to quiet title against Stay's unknown heirs. But we need not pursue this feature, nor allow the case to break on that point.

Assuming for the purposes of the case the most favorable view possible to the respondents, *viz.*, that Stay was alive when the tax suit was begun and alive when it finally culminated in a judgment, a sale, and sheriff's deed to Gossom, can the latter maintain his position that he was an innocent purchaser without notice of the claim and title of Adams in his lifetime and of Adams's widow and heirs after his death?

In the solution of the problem presented by that question a preliminary observation is not amiss, *viz*: If the possession of Adams, of the character hereinbefore set forth, had been continued on down to the date of the tax suit and sale, it could hardly be contended that Gossom had no notice of their claim and title. Such visible and notorious possession, coupled with such open *indicia* of domination and ownership, in and of themselves, are notice sufficient to put a pur-

chaser on inquiry, and a purchaser by a sheriff's deed in the face of such notice loses the charm of innocence, if he makes no inquiry after being put on the scent and trail of the truth. A purchaser at a tax sale, put on inquiry, who goes to sleep and makes none is no longer innocent. The law favors the diligent, and slumber is not equivalent to innocence in the practical administration of justice. It is gross negligence. Great neglect is equivalent to fraud (*Magna culpa dolus est,* as the maxim runs). Such purchaser takes subject to the title and equities of those in possession flying a flag of ownership and planting themselves under the folds of that flag. [Maupin v. Emmons, 47 Mo. 304; Conn. Mutual Life Ins. Co. v. Smith, 117 Mo. 292 *et seq;* Stuart v. Ramsey, 196 Mo. 415 l. c. *et seq;* Shaffer v. Detie, 191 Mo. l. c. 393 and cases cited.]

In the Shaffer case we ruled: "We assume appellant's contention is based on the doctrine that under our registry acts a deed should be recorded in order to impart notice. But visible possession of real estate, with acts of dominating control, improvements, the continuous cultivation of the land, etc., are as potential in imparting notice of a claim of title as the record of a deed. One may not be allowed to blindfold himself to the visible indices of ownership, such as abound in this case, and say that he had no notice. To this effect has always been the law in Missouri. [Bartlett v. Glasscock, 4 Mo. 62; Davis v. Briscoe, 81 Mo. 27.] And such is the general doctrine. [2 Dev. on Deeds (2 Ed.), secs. 760 and 769.] The possession of J. C. Morehead was continuously perpetuated down to the day of the trial, under the chain of title relied upon by respondents, and it became either actual notice or put appellant on inquiry and he is impaled on either horn of the dilemma."

Now in the case at bar the visible possession of the Adamses was not continued on down to the date of the suit, but was broken and interrupted for a con-

siderable time. Under such circumstances we are not prepared to rule that their stale sometime possession, in and of itself and without more, was sufficient to put Gossom upon inquiry. From what presently appears the precise point is not necessary to the case. It is therefore reserved until presented as decisive in some appeal.

*But in our case Gossom had notice of Adams' title and estate by the very proceedings under which he bought.* Adams was owner in fact. He was notified by publication as owner. He was sued as owner. The judgment proceeded against him as owner. The sheriff's notice of sale proclaimed to all purchasers that Adams' interest had been seized by an execution levy and was about to be sold. Gossom's bid was for Adams' interest and his sheriff's deed purported to convey it to him. Gossom entered into possession under that deed and therefore held possession on the theory that he had acquired title from Adams. Under such circumstances he could not be allowed to claim that he had no notice of Adams' title and claim. He was plainly put on inquiry and must be held to know what such inquiry, reasonably and diligently pursued, would have resulted in finding out. Under such circumstances knowledge is imputed to one who had the means of knowing at hand and the recitals of his title papers are somewhat in the nature of an estoppel upon him to deny Adams' title. [Wade on Law of Notice (2 Ed), secs. 308 and 309.]

That law-writer sums up the general doctrine in this way: "As a matter of fact a purchaser of real estate may be totally ignorant of the recitals in his own deed; yet every recital of a fact affecting the title to the premises, contained in such deed, will be presumed to be known to such purchaser, and he will be affected with notice thereof in the same manner and to the same extent as though he had actual knowledge. Therefore it may be said that notice derived from the recitals of

a deed to a purchaser is actual, though it clearly rests upon a presumption of law. It may be called actual, however, in the same sense that a written notice delivered to a party who never reads it may be called actual notice."

Speaking of notice in Conn. Mutual Life Ins. Co. v. Smith, 117 Mo. l. c. 292, we said through Sherwood, J.: "Notice in this connection does not mean positive information brought directly home to the party sought to be charged. Anything which will put a prudent man upon inquiry is notice. And gross negligence in failing to make inquiry when the surrounding facts suggest the existence of others and that inquiry be made, is tantamount in the courts of equity to notice. [Major v. Bukley, 51 Mo. 227; Leavitt v. LaForce, 71 Mo. 353; Roan v. Winn, 93 Mo. 503.] This is the universally prevalent doctrine of courts of equity in all jurisdictions. [2 Pomeroy on Equity Jurisprudence (2 Ed), secs. 596, 597, 598 599, 600 et seq.] And actual notice may be inferred from circumstances and by reasonable deductions therefrom. [Ibid.; Brown v. Volkening, 64 N. Y. 76.] Courts of equity, since their earliest foundation, have always recognized that the still, small voice of suggestion, emanating as it will from contiguous facts and surrounding circumstances, pregnant with inference and provocative of inquiry, is as potent to impart notice as a presidential proclamation or an army with banners."

At worst Adams' title was on the foot of an unrecorded deed, and it is settled doctrine that a purchaser at a tax sale, who has notice of an unrecorded deed, takes subject to the rights of the grantee in such deed since he stands charged with the knowledge that the apparent record owner was not the real owner. [Stuart v. Ramsey, 196 Mo. l. c. 414-5; Harrison Machine Works v. Bowers, 200 Mo. l. c. 232 et seq.; Zweigart v. Reed, 221 Mo. l. c. 43 et seq.] It is sound to reason

from similar to similar, for the precept is, concerning similars, the judgment is the same.

We rule, then, that Gossom bought with notice of the title of Adams. As the tax judgment was void as to Adams and his heirs, the ruling just made means that the case was wrongly decided, *nisi*.

(e). The subsequent suit instituted by Gossom against the unknown heirs of Nash and Stay availeth him naught. Whatever title Nash had was lost by him, the Statute of Limitations running in favor of Adams. Not only so but Gossom concedes that at the time he brought that suit he had notice of Adams' title and this included the unrecorded deed from Stay to John B. Adams with a resulting trust in favor of James F. Adams. He did not make the heirs of James F. Adams a party to his suit to quiet title. Not being parties, the maxim, Things done between strangers ought not to injure those who are not parties to them (*Res inter alios acta*, etc.), controls.

(f). We perceive no laches or estoppels against plaintiffs. Laches is an equitable doctrine proceeding regardless of the Statute of Limitations to do equity and is only applied to work out equitable results. As the facts do not warrant the application of that doctrine, the allegations relating to it in Gossom's answer are put aside.

(g). Plaintiffs amended their bill at the trial by tendering Gossom's bid and the taxes he paid on the land since his purchase. Defendants made no proof as to the payment of subsequent taxes and asked nothing on the tender.

The amendment to the answer was presumably under the Act of March 6, Laws of 1903, p. 254, entitled, "An Act Relating to Setting aside of Tax Deeds." Doubtless the tender misconceives the scope of the act. It has been ruled that the act does not apply to tax sales made prior to its passage. That it looks alone to the future and is in no sense retrospective. [Petring v.

Current River L. & C. Co., 111 Mo. App. 373; Haarstick v. Gabriel, 200 Mo. l. c 244 *et seq.;* Manwaring v. Company, 200 Mo. 718.] Hence if we reverse and remand it will not be necessary, in order to accomplish equity, to take into consideration the tender as the price of plaintiffs' decree.

The premises considered, it is manifest that the judgment is for the wrong party. Accordingly it is reversed and the cause is remanded with directions to enter judgment on the first count of the petition in favor of plaintiffs, decreeing and vesting title in them as against defendants. Absent any proof as to rental values or damages, the judgment on the second count should be for a nominal rental value and damages. We therefore direct the lower court to render judgment for possession in favor of plaintiffs and against the defendant, James H. Gossom, for one cent damages and one cent rental values and to award a proper writ to enforce the judgment. Costs to go against the defendant, James H. Gossom. All concur.