Eva M. Lossing v. Sam Shull, Ruby Shull and Ernest R. Moody, Appellants.—No. 38498.—173 S. W. (2d) 1.

Division One, July 6, 1943.

*Von Mayes* for appellants.

*Ward & Reeves* for respondent.

346

DALTON, C.—Action at law to quiet title and in ejectment for described lands in Pemiscot County. The cause was tried before the court in one hearing without the aid of a jury and no declarations of law were asked or given. ˙ The court found for plaintiff on each count and entered judgment. Defendants have appealed.

The first count, in usual form under Sec. 1684, R. S. 1939, Mo. R. S. A., Sec. 1684, alleged that plaintiff was the *fee simple owner* of the following described real estate in Pemiscot County, Missouri, to wit: ''All of the Northwest fractional Quarter of Section Six (6), Township Sixteen (16), North of Range Thirteen (13), East, being all of the North half of said section to the West bank of the Mississippi River.'' By answer defendants admitted that defendant Ernest R. Moody claimed ''some title, estate and interest in the land described'' and denied all other allegations.

The second count, in usual form under Sec. 1534, R. S. 1939, Mo. R. S. A., Sec. 1534, asked damages in the sum of $100 and fixed the monthly value of rents and profits at $1.00 per month. By answer defendants admitted that they were in possession of a particularly described part of said real estate (about five acres, fronting on the Mississippi River) and further alleged that defendant, Ernest R.

Moody and those under whom he claimed had been "in the actual, adverse, continuous and peaceful possession" of said particularly described part (of the lands claimed by plaintiff) under claim of ownership for more than ten years prior to the institution of the suit.

The sole issue presented by this appeal is whether the findings and judgment of the Court in plaintiff's favor on the two counts is supported by substantial evidence.

On March 1, 1860, a government patent was issued to one William Kimbrow for "Fractional Township Sixteen North of Range Thirteen East, in the district of lands subject to sale at Jackson, Missouri, [3] containing Eighty six acres, and six hundredth acres, according to the official Plat of the Survey of said lands, returned to the General Land Office by the Surveyor General." Plaintiff offered no conveyance from William Kimbrow, but offered a series of recorded deeds, as follows: (1) A deed from John Branch to James Jackson, dated December 14th, 1847, for 80 acres, more or less, fronting on the bank of the Mississippi for 110 poles down stream from "the Northeast corner of Fractional Township No. Sixteen North of Range No. Thirteen East"; (2) a deed from James W. Jackson to Eulaine F. Huffman dated September 3, 1877, for 100 acres more or less, fronting on the Mississippi River and particularly describing lands located in what is Fractional Section 6, Township 16 North of Range 13 East; (3) a deed of trust from Eulaine F. Huffman to W. M. Senter and W. T. Wilkins, dated February 2nd, 1895, describing 40 acres, "North East Part of Fractional Section 6, Township 16, Range 13"; (4) a partition proceeding between the heirs of Eulaine F. Huffman, deceased, filed October 16, 1901 (the petition describes 32.57 acres, being the north fractional part of Section No. 6 in Township No. 16, Range 13, East and other lands, and the judgment refers to the same land, while the commissioners' report, which was approved June 21, 1902, shows that "all of that portion of the Frank Huffman estate lying, being and situate in Section No. six (6) in Township No. sixteen (16) North of Range No. Thirteen (13) East" was set off to Mrs. Willie E. Watson); (5) a deed from E. H. Watson and wife to plaintiff, dated November 21, 1917, describing "allso all of that portain lying in Sec. 6, Township 16, Range 13 West," in Pemiscot County and other lands; (6) a deed from John Gardner to E. E. Watson, dated January 20, 1897, for one acre, more or less, of particularly described lands in Section 6, Township 16, Range 13 East; (7) a deed from E. E. Watson and wife, to plaintiff, dated March 21, 1918, conveying all of the grantor's right, title and interest in certain described real estate in Pemiscot County and "Also a part of the Northwest fractional quarter of Section Six Township Sixteen Range Thirteen East. . . . The interest hereby conveyed being that belonging to E. E. Watson as the husband of the late Willie E. Watson, deceased"; and (8) a deed from E. H. Watson and Carrie Watson to

348

plaintiff dated March 21, 1918, for certain described lands in Pemiscot County, ''Also part of the Northwest fractional Quarter of Section Six, Township Sixteen Range Thirteen East.''

James Jackson, mentioned, supra, was plaintiff's great grandfather. Eulaine F. Huffman, was her grandmother; Mrs. Willie E. Watson was her mother. Plaintiff claims part of the land in suit by purchase from her brother E. H. Watson and part from her father E. E. Watson, supra, part by inheritance from her mother and the remainder by accretions to such lands.

Jacob Huffman, 82 years of age, a son of Eulaine F. Huffman, testified: ''I am acquainted with this particular tract of land in Section 6, at the point immediately across the levee southeast of Cottonwood Point. . . . I have been acquainted all of my life with the fractional north part of Section 6, Township 16th North, Range 13 East, in this county. Up to the death of Willie E. Watson, Mr. Watson, her husband, had control of this land most all of the time. After the death of Willie E. Watson the plaintiff took charge of it. The plaintiff and her ancestors farmed quite a bit of land there from year to year. My father had a store building on it several years before he died. I think the land was fenced. Part of the land was in cultivation. I know where the old Watson home place was. It was on the upland of this tract in Section 6 about 40 years ago, about an eighth of a mile from the river. The house had a yard around it and the barn. 'An orchard was at the back or west of the house. I don't believe there were any cotton or corn patches on the land between the house and the river. There was no timber on the land between the house and the river when I was a boy. We played ball there. There wasn't a good big space between the house and the bank of the river. Us heirs were in possession of it for 40 years. I mean by possession that we were living on it. It wasn't fenced right up to the river bank. We were living in the house on the land and using some of the land and claiming the rest of it.''

J. A. Baker testified: ''I have known this land you are lawing about since 1904. Since then Mr. Watson looked after it and claimed it belonged to Ellsworth and Eva (plaintiff and her brother). I know where the old Watson home was. Mr. Watson claimed the accretion over to the river [4] and had it in charge. He didn't allow anyone to cut anything off it and I suppose the land belonged to the rest of the farm.''

Ellsworth H. Watson, plaintiff's brother, testified: ''I am acquainted with this fractional North part of Section 6 Southeast of Cottonwood Point. I was raised right there. . . . When I was a child the river bank was east of the home place from 200 to 300 feet. . . . My father, E. E. Watson, was in possession of the land from the home place to the river bank. When my mother died and the land was divided my sister, Eva Lossing, plaintiff, got it and

took possession of it and has held it ever since. So far as I know my mother and father claimed the land all the way to the river bank and was in possession of it. Q. What do you mean by possession? A. Well, there was a part of the home place, you might say, it built up there, the bank didn't cave any and it built up kind of a bar there and they played ball on it and first one thing and another, and the boat landing was farther away and we had our freight road out there to where the boats landed. Q. You didn't farm.that land? A. No, sir, not that individual part, I can't say it was farmed.''

John Curtis testified: ''I am acquainted with fractional Section 6 there. E. E. Watson claimed the accretion in this fractional section and he managed it during the time I lived there. I mean by managed it that it came through his wife and after they married he looked after the entire holding. After Mr. Watson turned the land over to Eva Lossing, her husband looked after it. . . . I remember a survey was made between Mrs. Lossing's land and the land north of it. Mr. Finley bought the land on the front and he was cutting willows on Mrs. Lossing's land and conceded he was wrong and quit cutting.''

Eric Taylor testified: ''I rented this fractional Section 6 from Eva M. Lossing, plaintiff, in June, 1932, and have had it under lease since then.''

Plaintiff testified: ''So far as I know my mother and father had possession of the territory between the home place and the river. When my mother died this land went to her heirs, my brother and myself and later it was divided and I got this portion. After I got it my husband died. My father looked after it until he died. He has been dead about seven or eight years.'' Plaintiff testified that Eric Taylor only rented the river front.

Plaintiff offered tax receipts showing payment of taxes on ''Part of Northwest fractional ¼ Section 6, Township 16, Range 13'' or ''West fractional part of Section 6, Township 16, Range 13 from 1928 to 1940, inclusive,'' and certain receipts for taxes paid by E. E. Watson in the same fractional Section 6 for 1923-1927. There was other evidence.

For defendants, defendant Shull testified as follows: ''I decided to acquire some land and I picked out this place and located on it.'' (The five acres claimed by Moody). ''It was on January 15, 1932, I tied up to this land and didn't float in on it then, but did between then and February. I hadn't landed there over a week when I occupied it.'' ''I just moved on it, beached my houseboat on it. The houseboat was located about the center of this tract.'' ''I don't know just the year I fenced this land, but I cut the willows off of it the first month I moved there. It has been fenced about seven years.'' ''I never paid any taxes on it; it was river land and—built out there.'' ''I claimed I owned it when I moved there, being well satisfied it didn't belong to anyone else, and this was the reason I claimed

it. . . . I denied ever since that anyone else owned it but me."
"I never talked to the plaintiff about this property, and never paid
a dime rent, not a cent."

Defendant Shull had a survey made of the real estate enclosed by
his fence and, on February 2, 1942, conveyed by warranty deed to
defendant Moody. Defendant Moody testified that he bought it
from Shull because he wanted to own it, as he thought he might use it
sometime for a ferry landing. He said with reference to defendant
Shull "I knew he just moved on the land. I presumed he didn't have
any record title. I figured he had title by adverse possession." De-
fendants Shull and wife now claim as tenants of Moody.

There was much rebuttal evidence tending to show that defendant
Shull did not locate on the real estate claimed by defendant Moody,
until in the Spring of 1933. The present suit was instituted February
20, 1942. There was also evidence that defendant Shull had paid
plaintiff rent for the land he was living on; that he paid some rent
in cash; that he worked out some rent by picking cotton; that on one
occasion he asked plaintiff if she would be [5] willing to take fish for
rent; that he paid fish rent (about seven or eight years ago) and that
the last four years plaintiff's eldest son "had gone and gotten fish."
There was also evidence that defendant Shull had admitted to wit-
nesses that the land he lived on belonged to plaintiff, and that he had
said he let plaintiff have fish for rent when she wanted it. Defendant
Shull, while denying he ever paid plaintiff any rent or fish for the
land he sold to Moody, admitted he had paid plaintiff rent on lands
outside his enclosure for a potato patch and that he bought some
wood from her on the land he rented for a potato patch.

It is admitted that the five acres of land claimed by defendant Moody
is located in the north half of fractional Section 6, Township 16 North,
Range 13 East; that it is a part of the lands claimed by plaintiff; that
it is all accreted land; that it lies between the 1841 west bank of the
Mississippi River and its present west bank; and that it occupies only
a portion of the river front claimed by plaintiff. There is no evidence
expressly showing when the land claimed by defendant Moody formed
as an accretion, but there is evidence that subsequent to the original
government survey the river bank "caved" for some "32 chains and
9 lengths" and that "the river is now accreting east out toward the
channel. Within the last 45 years the river bank was within 200
to 300 feet (to the east) of the Watson home, but now the Shull
house on the accreted land (in dispute) is located about one-eighth
of a mile east of the Watson home place.

While the sole issue presented by the appeal is the sufficiency of
the evidence to support the judgment for plaintiff, the appellants
contend (with reference to the first count) that plaintiff pleaded
a fee simple title; that she didn't prove it by the records, because of
the defective descriptions in her deeds and the complete break in

her chain of title between Kimbrow and Branch; that she couldn't prove fee simple title by adverse possession, because no such title was pleaded (the petition does not allege title by adverse possession); that no common source of title was agreed upon or proved (so that the court could not determine the better paper title); that there was no proof of adverse possession by plaintiff of the lands claimed by defendant Moody, since plaintiff and those under whom she claims "had no actual possession of the space between the old Watson home place and the river and exercised no sufficient control over same under color of title"; that plaintiff had no title by adverse possession to the land to which said lands accreted, because title to such lands had not eminated from the United States Government, and because "plaintiff proved no title by adverse possession to any of the land to which said parcel claimed by defendants accreted"; and that plaintiff having no title and proving no title, "could not be concerned in his (Moody's) title."

Appellants make similar contentions as to the second count, and say that plaintiff may not recover without proof of title by adverse possession; that the statute did not run in her favor as to any of the land described in her petition; that she did not own the land to which the accretions formed, when they formed; that she never had actual possession of the accreted lands; and that, even if she had a naked prior possession (of the lands claimed by defendant Moody) by and through her alleged tenant Shull, she could not oust defendant Moody, who is in possession under color of title.

Ordinarily when an action at law is tried before the court without the aid of a jury as here, and no request is made for findings of fact or conclusions of law, and no declarations of law are asked or given when the case is submitted, and the court does not indicate the theory upon which it acted, and no other assigned errors appear, the judgment will be affirmed if it can be sustained on any reasonable theory. Murphy v. Doniphan Telephone Company, 347 Mo. 372, 147 S. W. (2d) 616, 618; Conley v. Crown Coach Company, 348 Mo. 1243, 159 S. W. (2d) 281, 287; Briggs v. Kansas City Joint Stock Land Bank, 328 Mo. 23, 40 S. W. (2d) 682; Carter-Waters Corporation v. Buchanan County (Mo. Sup.), 129 S. W. (2d) 914.

In this case defendant Moody claims under a deed from defendant Shull and wife dated February 2, 1942. The present suit was instituted February 20, 1942. According to plaintiff's testimony, which was supported by other evidence, defendant Shull was her tenant and had been paying her rent for the particular premises in dispute. His possession as her tenant was, therefore, her possession. The deed of Shull and wife to defendant Moody conveyed [6] nothing and defendant Moody took no title or possession as against plaintiff.

Section 2973, R. S. 1939, Mo. R. S. A., Sec. 2973, provides: "The attornment of a tenant to a stranger shall be void, and shall not

in anywise affect the possession of his landlord, unless it is made, first, with the consent of the landlord; . . . '' The deed from Shull to Moody, made while Shull was in possession as plaintiff's tenant and made without the consent of plaintiff, had no effect in depriving plaintiff of her possession. Merchants Bank of St. Louis v. Clavin, 60 Mo. 559, 562; Dausch v. Crane, 109 Mo. 323, 335, 19 S. W. 61; Farrar v. Heinrich, 86 Mo. 521, 531; Benoist v. Rothschild, 145 Mo. 399, 409, 46 S. W. 1081; Jackson v. Ward (Mo. Sup.), 292 S. W. 7, 12. Defendants Shull and wife, as tenants of plaintiff, could not dispute the title of plaintiff, their landlord. Renshaw v. Reynolds, 317 Mo. 484, 297 S. W. 374, 377. Plaintiff, therefore, by reason of her prior possession under claim of ownership was entitled to prevail against defendant Moody and against defendants Shull, who now claim under him. ''A party in possession under claim of ownership has a better title than one who has no title or possession.'' Johnson v. McAboy, 350 Mo. 1086, 169 S. W. (2d) 932, 935, and cases cited. It would seem, therefore, that the court properly determined the title as requested between plaintiff and defendants and that the judgment on both counts is supported by substantial evidence, regardless of the particular objections urged by appellants. However, these objections will be considered.

It may be conceded that the evidence is insufficient to show a record title in plaintiff, but the question is whether the evidence is sufficient for the inference to be drawn that plaintiff and those under whom she claims have been in the actual, open, hostile, notorious, continuous, exclusive and adverse possession of the west high bank of the Mississippi (to which the accreted lands claimed by defendant Moody formed) for a sufficient period of time to vest title by limitations; and whether plaintiff and those under whom she claims were in adverse possession of the west high bank under claim of ownership when the lands claimed by defendant Moody were being formed. There is evidence that while in possession of the west high bank of the Mississippi River, the plaintiff and those under whom she claims, claimed the accreted land between the occupied lands and the river, supervised, looked after and were in possession of said accreted lands, prevented trespassing and the cutting of willows, and made such use of said land as they desired, including playing ball on it, leasing and renting it to others. If plaintiff and those under whom she claims owned the bank to which the accretions formed, they of course owned and took title to the accretions, and it is immaterial whether they had record title to such accretions, had color of title, or ever had actual physical possession and occupancy of such lands, so long as others acquired no title by adverse possession. The finding by the court in plaintiff's favor, of course, disposed of defendant Moody's claim of title by adverse possession to the five acres of accreted lands.

Appellants contend the statute of limitations did not run in plaintiff's favor as to any of the lands described in the petition, because the description in the patent to William Kimbrow was so fatally defective that title had not eminated from the United States Government, and that in any case plaintiff not having expressly pleaded title by limitations could not prove title in that manner.

It will be unnecessary to determine whether plaintiff should have affirmatively pleaded title by adverse possession. There was no timely objection to either pleading or proof. See, Frazier v. Shantz Real Estate & Investment Company, 343 Mo. 861, 123 S. W. (2d) 124, 132. Defendants may not now complain that plaintiff could not prove the *fact of ownership*, as alleged, and prove it by the *evidence* offered and received without objection. "It (adverse possession) not only creates a bar but confers title to real estate." Adams v. Gossom, 228 Mo. 566, 578, 129 S. W. 16; Moore v. Hoffman, 327 Mo. 852, 39 S. W. (2d) 339, 343; Matthews v. Citizens Bank, 329 Mo. 556, 46 S. W. (2d) 161, 162; Franklin v. Cunningham, 187 Mo. 184, 196, 86 S. W. 79; Sec. 1002, R. S. 1939, Mo. R. S. A., Sec. 1002.

Was the description in the patent sufficient? We think it was. It purports to grant to William Kimbrow "Fractional Township Sixteen North of Range Thirteen East . . . containing 86 acres, and 6/100 of an acre, according to the official Plat of the Survey of said lands, returned to the General Land Office by the Surveyor General." See, Campbell v. Wood, 116 Mo. 196, 22 S. W. 796. It further [7] appears from the plat in evidence that only this Northwest corner of Township 16 North, Range 13 East, extends beyond the west bank of the river. It is immaterial that the state and county wherein the land lies was not expressly named. Myher v. Myher, 224 Mo. 631, 637, 123 S. W. 806. The description is sufficient. The patent was filed for record in Pemiscot County on February 4, 1890.

Appellants contend further that the descriptions in the deeds in plaintiff's chain of title are so defective that they do not constitute color of title under Section 1006, R. S. 1939, Mo. R. S. A., Section 1006, to any part of the lands claimed by defendant Moody. A deed, to constitute color of title, must of course include the land in respect to which it is invoked (Slicer v. Owens, 241 Mo. 319, 145 S. W. 428; Campbell v. Laclede Gas Light Company, 84 Mo. 352, 371), but it will not be necessary to determine whether the deeds were sufficient to constitute color of title, since appellants refer particularly to the application of this section to the five acres of accreted lands now claimed by defendant Moody. It was not necessary, as we shall see, for plaintiff's deeds to give her color of title to the accreted lands, because if plaintiff's adverse possession and occupancy of the river bank extended for a sufficient length of time to give her title to the land actually held in adverse possession, it was also sufficient to give her title to the accretions forming to such lands.

354

Appellants contend that "plaintiff, having failed to show legal title in any one at any time *at the water's edge,* cannot maintain ejectment for accretion land . . . (and that) plaintiff established no such title by deeds or adverse possession in any land at the water's edge at any time." It is further contended that, if plaintiff (and those under whom she claims) acquired by adverse possession any part of the lands claimed by her, title was not acquired to the water's edge, so that accretions would attach to such lands; and that the title acquired by adverse possession, if any, was limited to lands back from the river and were not the lands to which the lands claimed by Moody accreted. Appellants point out that "the ownership of accretion lands depends upon the ownership at the water's edge when the accretion land is made." If it is appellant's contention that a party can never get title by limitations to the water's edge while accretions were being formed (on the theory that since when the period of limitations runs and title vests to lands ten years in the party's possession, it will not vest as to the newly formed lands which have been in existence less than ten years), this contention is fully answered in Benne v. Miller, 149 Mo. 228, 238, 50 S. W. 824, where the court said: "An accretion becomes a part of the land to which it is built, and follows whatever title covers the main land, whether it be title by deed or title by possession. In its nature it is not susceptible, during its forming, of that kind of possession which distinguishes the occupation of dry land. But it attaches to the dry land even while it is yet under water, and belongs to the owner of the land, and is in the actual possession of him who holds the actual possession of the main land. If the main land is in fact unoccupied, it is in the constructive possession of the owner of the true title, and with it goes the constructive possession of the forming accretion. But, if the main land is held in adverse possession to the true owner, he is not in constructive possession of the accretion, and since the accretion in its formative state is not susceptible of actual occupancy in the sense of a pedis possessio, the indicia of the actual possession of him who holds the main land are extended over the forming accretion, and bring it within his actual possession. And it is not necessary that such possession of the accretion should be held for ten years to give the possessor title, because title to it follows title to the main land, and when the latter is held under the conditions and for the length of time required by law to vest the title in the possessor, the title to the accretion follows, even though the deposit had been made but a year or a day. One who acquires title to the main land by ten years' adverse possession, acquires title to river deposits made and making on his front before and during the period in which his possessory title was forming. The accretion grows into the land, and grows into the title of him who holds the land as the title itself grows, and when the title to the main land has become per-

fect it extends over the accretion however recent its formation. [Campbell v. Laclede Gas Light Company, 84 Mo. 352.]'' See, also, Frederitzie v. Boeker, 193 Mo. 228, 233, 92 S. W. 227; 2 C. J. 227, sec. 481; 2 C. J. S., Adverse Possession, sec. 205; 67 C. J. 826, sec. 230.

Appellants further contend that ''title by adverse possession extends only to the boundaries of the land actually occupied and would not extend to accretions already formed, unless actually occupied during the same period.'' In effect, it is appellants' contention that plaintiff and those under whom she claims were not shown to have been in the actual adverse possession of the slope from the high cultivated lands on the river bank down to the water's edge, or of the sand bars to which additional accretions formed; and that there was an intervening strip of land (a few hundred feet) between the lands in the open and notorious adverse possession of plaintiff and the water's edge proper, so that the accretions did not attach to the lands in plaintiff's possession. The question is, when is a party in adverse possession of a river bank to the water's edge? We think the evidence sufficient for the inference to be drawn that plaintiff and those under whom she claims were in the actual, open, hostile, notorious, exclusive, continuous and adverse possession, for more than ten years, not only of the lands actually occupied and in cultivation on the high bank of the river, but of the intervening lands down to the water's edge, and that plaintiff and those under whom she claims were in such possession when the lands claimed by defendant Moody were formed. These intervening lands, as the evidence shows, were not subject to the same type of use and occupancy as the tillable land on the bank. ''What acts will characterize possession as 'actual' depends on the facts of particular cases. The nature and location of the property, the uses to which it can be applied, and all the circumstances must be considered.'' Cashion v. Meredith, 333 Mo. 970, 64 S. W. (2d) 670, 672; Frazier v. Shantz Real Estate & Investment Company, supra, (123 S. W. (2d) 124, 131); Benne v. Miller, supra, (149 Mo. 228, 237, 240); Ozark Plateau Land Company v. Hays, 105 Mo. 143, 16 S. W. 957; Goltermann v. Schiermeyer, 111 Mo. 404, 421, 19 S. W. 484, 20 S. W. 161; Tillman v. Hutcherson, 348 Mo. 473, 154 S. W. (2d) 104, 106; 2 C. J. 54, sec. 16; 2 C. J. S., Adverse Possession, secs. 22 and 38(d). The evidence is sufficient to support the judgment.

The judgment is affirmed. *Bradley* and *Van Osdol, CC.,* concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.