In the Matter of the ESTATE of Alexander KAUPPI, Incompetent, Insurance Company of North America, Appellant,

v.

Dola Crider BRIDGES, Respondent.

No. 55103.

Supreme Court of Missouri, Division No. 2.

Jan. 11, 1971.

Motion to Transfer to Court En Banc Denied Feb. 8, 1971.

Donald F. Flint, Clayton, for appellant.

Sale, Evans & Campbell, David L. Campbell, Clayton, Morris M. Rosenthal, St. Louis, for respondent.

BARRETT, Commissioner.

This is an appeal by the Insurance Company of North America, surety on a guardian's bond, from a circuit court judgment finding and decreeing that the guardian of Alexander Kauppi's estate, F. G. Armstrong, had failed, in accordance with a probate court order, to make a complete settlement of his guardianship, that his surety's proposed settlement to death of ward had not been approved by the probate court and that he had not been discharged as guardian. Therefore the circuit court entered a judgment in favor of the administratrix-beneficiary of Kauppi's estate, Dola Crider Bridges, against the guardian and the appellant surety in accordance with

the probate court's restated account in the sum of $23,560.39, with interest at 6% from June 15, 1965.

The appeal and its consequent problems arose in these circumstances and in this background; all as revealed by the pleadings, an agreed statement of facts and the testimony of a clerk-auditor from the probate court. On March 31, 1964, Alexander Kauppi, by reason of senility, was adjudged incompetent and F. G. Armstrong was appointed guardian of his person and estate with the Insurance Company of North America as his bonded surety. Mr. Kauppi's estate consisted of government bonds and cash totaling in the probate court's restated and amended account $41,383.24. The assets of the guardianship estate, it was stipulated, "were subject to the joint control of Insurance Company of North America." On February 4, 1965, Mr. Kauppi died and Armstrong was appointed executor of his estate "without bond." On April 23, 1965, Armstrong filed a settlement to death of ward showing, less certain necessary expenditures, the above-mentioned property, including $12,147.48 on deposit in the First National Bank. This settlement by the guardian was never approved by the probate court even though there were certifications from the bank of the existence of the assets. On June 10, 1965, the surety, Insurance Company of North America, released its joint control and on June 15, 1965, the contents of the safety deposit box (the bonds) were delivered to Armstrong as executor and on the same day he, by check, transferred the bank accounts from himself as guardian to himself as executor. Thereafter, by three checks, he paid to Mrs. Bridges, Kauppi's sole beneficiary, $14,000.00 and in March 1966 he paid medical and funeral bills of $3822.85. In the meanwhile, however, between the dates of June 15, 1965, and December 16, 1966, until in the language of surety's counsel, the assets became "completely dissipated," Armstrong wrote checks for his own purposes, all to "unknown," totaling $23,560.39. After that, of course, on December 30, 1966, Armstrong was removed as executor and Mrs. Bridges was appointed.

In this background, in October 1967 the surety, Insurance Company of North America, filed in the probate court, in the guardianship, a "petition for approval of settlement to death of ward, and for discharge of guardian and surety." In its petition the surety alleged that in April the guardian, Armstrong, had filed his settlement to death of ward. It did not allege, however, that the settlement had been approved by the probate court. It did allege that in the same month, April 1965, he had filed an inventory and appraisement charging himself with the balance due on the settlement filed. It was alleged that in May 1965 certifications confirming the existence of assets were filed, that in June 1965 vouchers in support of the settlement were filed and that on March 12, 1965, Armstrong had been appointed executor of the estate of his deceased ward. Therefore, the surety prayed an order approving the guardian's settlement filed two and one-half years previously.

In response to the surety's petition in probate court Mrs. Bridges filed an answer setting forth many of the facts concerning Armstrong's administration as guardian but after alleging the bond and its provisions she alleged that Armstrong had absconded and that prior to the date of his filing the report in the guardianship estate he had converted all the assets of the estate and so she prayed judgment against the guardian and his surety for the balance due. In addition to the probate court audit Mrs. Bridges filed an affidavit acknowledging a purported "partial distribution" asserting at the same time Armstrong's settlement had not been approved by the court.

The probate court upon the agreed facts and its own records revalued the guardianship estate as of June 15, 1965, as $41,383.-24 and as so valued *"restated"* the settlement to death of ward and ordered Arm-

strong as guardian and the appellant as surety to effectuate delivery to Mrs. Bridges of the net balance due, $23,560.39, together with interest at 6% from June 15, 1965.

The surety appealed the probate court judgment which as stated was submitted on the agreed facts. The deputy clerk-auditor of the probate court testified that a final receipt had never been filed in the guardianship and that on March 18, 1965, Armstrong had been "ordered to settle to death of ward on or before April 5, 1965," but had not done so. The circuit court upon this record filed a memorandum opinion in which it found that Armstrong "has failed to make a full and complete settlement of his accounts as Guardian" and that "said settlement was not approved by the Probate Court, and that said Guardian was not discharged as such as required by law." The court found that the probate court "has only approved said account as restated." And so the circuit court decreed as a matter of law "until a full and accurate final settlement of a guardian is filed and approved by the Probate Court and discharge entered" the guardian and his surety remained liable to the ward and. his successor, Mrs. Bridges, until discharged in accordance with the applicable statutes. Accordingly the circuit court entered judgment against Armstrong as guardian and his surety, the appellant.

Upon this appeal the surety with competence and force attacks the findings, rulings and judgments of the two courts contending that as a matter of law, on June 15, 1965, there had been a complete transfer of guardianship assets by Armstrong in his capacity as guardian to himself in his capacity as executor, that his conversion of all assets occurred after that date and after that transfer and thereby the surety in the guardianship was relieved of all liability for his conversion. This, it may be said, is the crux of the appeal. The respondent has unnecessarily complicated matters by urging in this court-tried case (Civil Rule 73.01, V.A.M.R.) that the appellant did not file a motion for new trial, that there is sufficient evidence to support the judgment and therefore it should be affirmed. And despite the enactment of the probate code in 1955 the respondent here urges, despite the two courts' allowances of 6% interest from which she has not appealed, that she is entitled to recover compound interest at the highest legal rate on the converted assets from the date of their conversion. The case upon which she principally relies, In re Hoerman's Estate, Mo., 247 S.W.2d 762, recognizes a discretion in the court as to the allowance of interest and even at that date, 1952, "there is no statute making such a requirement." On the merits of the appeal the respondent urges that Armstrong breached his duties as guardian with a consequent liability to the surety for the "resultant loss" in that he did not make a final settlement because there was not a "just and true exhibit of the account" between himself and his ward, that he "did not make a final settlement with the court" and, finally, that a transfer of guardianship assets without a court order was a breach of his duty as guardian. In addition the respondent asserts that by releasing joint control the surety is estopped to deny liability for Armstrong's conversion of assets. The appellant surety replies that these arguments do not "meet the issue of just what defalcations occurred in Armstrong's accounts *as guardian*." The surety concedes, as it must, that Armstrong breached his duty as guardian in several respects; for example, that prior to June 15, 1965, he did not obtain probate court approval of his settlement to death as required by § 475.290. But it is asserted that these breaches had nothing to do with the actual financial losses, the surety urges that its liability as surety "is limited to damages directly occasioned by acts of the guardian in his capacity" and character as guardian only and since the conversions all occurred after June 15, 1965, and after he became executor that his conduct as guardian "did not result in loss" to the guardianship estate. In short, it is contended that all losses re-

sulted from his conduct as executor—that the losses were all to the executorship estate.

■ Concededly, the obligation of the surety is measured and limited by the principal's obligation and "is not to be held beyond the terms of his contract. He is bound by his agreement and nothing else." Tittman v. Green, 108 Mo. 22, 33, 18 S.W. 885, 887, the first of the Branch cases. But these generalities do not suggest the indubitable answers to the problems involved. It may also be conceded that in some instances and circumstances a guardian or other fiduciary acting in two capacities may by his actions shift his liability and that of his bondsmen from a bond given in one capacity to that given in a second capacity. Annotation 111 A.L.R. 267, 268. But it is not necessary here more than eighty years after the Branch cases to consider the "retainer of assets" doctrine or reconsider the rule that liability hinged on whether at the time the guardian converted his ward's assets he was then personally solvent. It may be noted, however, that the absence of any fact upon which the doctrine is predicated may prevent application of the doctrine of retainer of assets. 111 A.L.R. 1.c. 292. In this category fall the instances in which the fiduciary "had the right for the time being to hold the assets in the capacity in which he had received them." 111 A.L.R. 1.c. 289. And finally, as to the generalities, "Where property is not transferable to the fiduciary in his second capacity, the bond given in the first capacity remains liable in respect thereof * * * and the bond given in the second capacity does not become liable, even though the fiduciary distinctly undertakes to assume control thereunder." 111 A.L.R. 1.c. 270. There is indeed a forceful analogy in the latter rule. The Hospes-Branch cases received extensive treatment throughout 111 A.L.R. 1.c. 269–271, 275, 283. They must all be viewed in the context of the four appeals and the ten years necessary to terminate the litigation resulting from Branch's con-

version of his ward's estate. Tittman v. Green, 108 Mo. 22, 18 S.W. 885; State ex rel. Hospes v. Branch, 112 Mo. 661, 20 S. W. 693; State ex rel. Hospes v. Branch, 126 Mo. 448, 28 S.W. 739; State ex rel. Hospes v. Branch, 134 Mo. 592, 36 S.W. 226; State ex rel. Hospes v. Branch, 151 Mo. 622, 52 S.W. 390. The significant and distinguishing factor in this and the Branch cases is that in those cases the probate court "formally approved said settlement" and "finally discharged" the defaulting curator. State ex rel. Hospes v. Branch, 112 Mo. 1.c. 665, 20 S.W. 1.c. 693. In the end, in the Branch litigation, the court wound up interpreting its prior opinions and judgments. State ex rel. Hospes v. Branch, 151 Mo. 1.c. 637, 52 S.W. 1.c. 394; State ex rel. Hospes v. Branch, 134 Mo. 1.c. 602, 36 S.W. 1.c. 228, 229. Persuasive as some of the generalities may be they are necessarily factors of limited significance and need not stand alone in resolution of this appeal.

Of greater force and significance are the provisions of the probate code, particularly the general provisions and those governing guardianship, chapters 472, 473 and 475. It is not necessary, however, to examine in detail the numerous provisions cited by the parties, it is sufficient to note only those of the greatest force. To begin with the powers and duties of the guardian: "*The guardian* of the estate of a minor or incompetent *shall, under supervision of the court,* protect and preserve the estate * * * apply it as provided in this code, * * * *perform all other duties required of him by law,* and at the termination of the guardianship, deliver the assets of the ward to the persons entitled thereto." RSMo 1969, § 475.130 V.A.M.S. He is to make annual and other settlements, present verifications of assets and "1. *Guardians shall make final settlement* of their guardianship *at a time fixed by the court* * * * within sixty days after termination of their authority. For the purpose of settlement, the guardian shall make a just and true exhibit of the account

between himself and his ward, and *file the same in the court having jurisdiction thereof * * *. 3. At the time specified * * * the court * * * shall proceed to examine the accounts of the guardian, correct all errors therein, * * * and make a final settlement with the guardian.*" RSMo 1969, § 475.290, V. A.M.S. And finally, *"the court shall order payment* of the amount found to be due, *and the rendition of any effects, * * ** belonging to the ward, or to the successor of the guardian * * * or other person designated by the court * * * and enforce the order by attachment or execution against the guardian and his sureties." RSMo 1969, § 475.300, V.A.M.S. The italicized language emphasizes the importance of the probate court and its function in guardianship and particularly in terminating the guardianship and discharging the guardian. Not alone by implication is a final settlement required, the final settlement to be conclusive must be made as provided in the statutes and under the supervision, control and judgment of the probate court. Until the specified procedure is followed and the final settlement approved by the court "it was not a final settlement and cannot have the force and effect of one." May v. May, 189 Mo. 485, 502, 88 S.W. 75, 79. And, "Notwithstanding the termination of the authority of a guardian (as it may be interpolated by the death of his ward) * * * he shall continue to have such authority * * * *subject to the control of the court and to such limitations on such authority as the court may impose.*" RSMo 1969, § 475.285, subd. 3, V. A.M.S. There is not complaint here of the probate court's ultimate conditional order, in fact the surety says that it has no quarrel with the circuit court's general statements of law that "until a full and accurate final settlement of a guardian is filed and approved by the Probate Court and discharge entered, said guardian and his surety remain liable to the ward and his successors for any defalcation *in the accounts of said guardian* until so discharged." (Emphasis by counsel to itali-

cize its basic point that the defalcations here did not proximately result from the guardianship but in the character and capacity as executor.) And so it stands conceded, even though belatedly made, that Armstrong's purported settlement was not approved, there has been no final settlement and he was not discharged as guardian.

The appellant's bond was not an exhibit but of necessity it contained this all encompassing language "shall faithfully administer said estate, account for, pay and deliver all money and property of said incompetent * * * *and perform all other things* touching said guardianship *required by law, or the order or decree of any court having jurisdiction,* then the above bond to be void, otherwise to remain in full force." RSMo 1969, § 475.100, V.A.M.S. p. 92. Armstrong has not done the "things" required by law, he has not obeyed the decree of the probate court and thus he has never filed the settlement required by the court's order and he has not been discharged as guardian.

There is present also in this appeal a persuasive equity maxim if not doctrine. In the guardianship estate the appellant surety had joint control of all guardianship assets with its principal, Armstrong. Admittedly, that joint control was voluntarily relinquished. It is argued, since the verifications of assets were present, that there is "no statutory requirement that there be a prior order of the Probate Court authorizing the executor to take over personal property" and, again, of course, it is said that these failures were not the proximate cause of the losses, that the defalcations were as guardian. Nevertheless, the circumstances bring to the forefront the auxiliary principle or maxim that "where the prejudicial situation has resulted from the wrongful conduct of a third person the injurious consequences must be borne by the party whose conduct made the situation possible, here the surety, not the school district." Bolivar Reorg. School Dist. No. 1, Polk County v. American Surety Co.,

Mo., 307 S.W.2d 405, 410; 27 Am.Jur.2d §§ 146–147, pp. 682–683.

Intensive research has not produced precisely similar circumstances and particularly no cases dealing with the appellant's perhaps unique argument of the capacity in which the losses occurred, that is, that "the loss must be proven to have been the direct and proximate result of Armstrong's acts as guardian." One case tending to give some support to the surety is American Fidelity Co. v. Barnard, 104 N.H. 146, 181 A.2d 628 but there the probate court had the simultaneous settlement of two accounts and estates, one as executor and the other as trustee and the losses were carefully segregated to the two capacities. There was no claim or question in that case requiring the construction of applicable statutes and the effect of failing to secure a final settlement before transfer of assets. Another case similar on its facts is McManus v. Sears, 252 Iowa 1053, 109 N. W.2d 630. There a curator transferred assets to himself as executor but "(o)n the same day * * * the court discharged Sears as guardian and exonerated his bond." In that posture the court said, as the surety here argues, "Before a surety on a guardian's bond may be held liable, breach of the bond and resulting loss to the guardianship must be shown." There the court reasoned that "the vital question seems to be whether assets in the hands of a fiduciary in one capacity are in actual existence at the time they are transferred to himself in a second fiduciary capacity *in which he is entitled to hold them*. If so his bond as the first fiduciary is ordinarily not liable for a subsequent misappropriation. Where, however, no property or fund to transfer existed and the fiduciary was insolvent and unable to restore it, no transfer can be regarded as having taken place so as to relieve the bond given by him in his first fiduciary capacity." (Emphasis supplied.) It is not believed that "solvency" of the guardian should be or is a factor any more than the fact of no bond in his capacity as executor, as here, should

be a factor. The plain implication of the Iowa case is that if in his second capacity as executor he was not "entitled to hold" the funds, there would be no valid transfer and consequently a liability on him and his surety as guardian. In this case there was no final settlement, there was no approval of accounts and no discharge of principal or surety. Until these prerequisites were met, that is a settlement and discharge or authority to transfer in compliance with the statutes and the court's orders and decrees, after correction and restating accounts even though he had qualified as executor, he was not, in the language of the Iowa court, "entitled to hold them."

▮ To recapitulate, there was no final settlement as guardian and no court approval, in short, there was no act by Armstrong as guardian in compliance with the law or with the court's orders to terminate and finally close his guardianship. Plainly, obtaining approval of his restated final settlement, complying with the court's orders and finally a court discharge were essential prerequisites to his release in his capacity as guardian. The surety's contention assumes as a prerequisite to Armstrong's liability that there must have been a conversion of assets during the calendar period of his guardianship to create liability on his bond. The assumption overlooks the fact that the accounting for assets was not the guardian's only obligation; failure to make final settlement and failure to comply with the court's orders and decrees was likewise a breach of his bonded obligations. Compliance with statutory procedure is the orderly manner of legally terminating a guardianship. The bond was not by its terms solely to secure the financial defalcations of the guardian, it was also security against his maladministration as guardian, the appellant surety was "firmly bound" by the conditions that the guardian would account for all assets and that he would *"perform all other things touching said guardianship required by law, or the order* or decree of any court having jurisdiction" (V.A.M.S. § 475.100, p. 92) and in

all these respects, admittedly, Armstrong has defaulted. He defaulted in making a final settlement because when that became the central issue in his guardianship estate and the jurisdiction of the probate court was finally invoked he did not and obviously could not make a final settlement with the court. If he complies with the court's conditional order there of course will be no problem—thus far the only thing he has done is by reason of his right to possession, not title (State ex rel. Emmons v. Hollenbeck, Mo.App., 394 S.W.2d 82, 88), is transfer the assets from himself in one capacity to himself in another capacity —and there has been no approval of accounts and discharge as guardian and of course a final release from bonded guardianship obligations was not accomplished by his mere paper accounting.

In conclusion, in the circumstances of this particular record, by reason of the plain implications from the noted cases, the equitable maxims and the governing statutes, the judgment is affirmed.

STOCKARD and PRITCHARD, CC., concur.

PER CURIAM:

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court. All of the Judges concur.