Buford GILLIAM and Thelma Gilliam,
Plaintiffs-Respondents,

v.

Leona HOPKINS, Individually and as
Guardian of the Estate of Essie Yount, In-
competent, et al., Defendants-Appellants.

Nos. 9029–9031.

Springfield Court of Appeals,
Missouri.

Oct. 8, 1971.

Motions for Rehearing and Motion for Trans-
fer to Supreme Court Denied
Oct. 28, 1971.

G. C. Beckham, Steelville, for defendant-appellant Leona Hopkins.

Raymond R. Roberts, Roberts & Roberts, Farmington, for defendant-appellant Ogie Selinger.

J. Richard Roberts, Jack C. Stewart, Dearing, Richeson, Roberts & Wegmann, Hillsboro, for defendant-appellant Travelers Indemnity Co.

Marvin L. Dinger, Ironton, for plaintiffs-respondents.

HOGAN, Judge.

This is an action to recover funds converted by defendants Leona Hopkins and Ogie Selinger in their respective representative capacities to the use and benefit of the Estate of Essie Yount, Incompetent, and the Estate of Essie Yount, Deceased. Trial to the court has resulted in a judgment adverse to the defendants and their surety. The defendants have appealed separately.

The appeals and their consequent problems involve actions taken and judgments rendered in three courts over a period of nearly five years, and come to us against a factual background which we must state in some detail. On May 15, 1965, defendant Leona Hopkins was appointed guardian of the person and estate of Mrs. Essie Yount, her mother, upon adjudication by the Probate Court of Iron County that Mrs. Yount was incompetent and incapable of managing her estate. An inventory and appraisement was filed on August 20, 1965, and one of the assets listed was an 85-acre tract of land located in Washington County. The land was appraised at $2,000 and constituted the estate's principal asset. On August 20, 1965, Mrs. Hopkins petitioned the probate court for an order to sell the inventoried realty to provide funds for the ward's support. The court directed that the property be sold at private sale for cash, and on August 30, 1965, the guardian reported the sale of the property to plaintiffs for the sum of $4,875. On September 11, 1965, the probate court confirmed the sale and ordered the execution of a deed, and on that same day the guardian filed a bond with defendant Travelers Indemnity Company as surety in the sum of $5,000. It is stipulated that also on this same day, September 11, 1965, Mrs. Hopkins delivered a guardian's deed to the plaintiffs, conveying the property described in the inventory and appraisement.

Plaintiffs presented their deed for recordation in Washington County on September 20, 1965, only to be informed that on July 10 a warranty deed conveying the same property to one Donald Bennie Moses had already been filed and recorded. The warranty deed had been executed on April 24, 1965, by Mrs. Yount. Plaintiffs took the matter up with Mrs. Hopkins and her attorney, and, according to plaintiff Buford Gilliam, Mrs. Hopkins' attorney "said he would bust the deed." Plaintiffs said they would rather have their money back, and it was their evidence that Mrs. Hopkins told them they would either get a "good deed or [their] money back." The plaintiffs did not consider Mrs. Hopkins' assurances sufficient, and on October 21, 1965, they filed suit against Mrs. Hopkins in the circuit court, alleging in substance that she was guardian of Mrs. Yount's estate, that the property in question had been listed as an asset of the estate, that Mrs. Hopkins had "represented to plaintiffs that her charge [sic] was siezed [sic] of an indefeasible estate in fee in said property * * * and that the same was free and clear of any encumbrance." Plaintiffs further recited the delivery of the guardian's deed, payment of the sum of $4,875 to defendant as guardian and payment of $250 to Trainer Realty "as commission," the existence of the Moses deed, and then alleged that payment had been made "relying upon Defendant's representation that she had a good title to said property, where in truth and fact she did not. * * *" Plaintiffs further alleged demand for the sum of $5,125, and defendant's refusal to return the amount paid. Service was obtained on Mrs. Hopkins on October 21, and on the same day a copy of the petition and writ of summons was filed in the probate court.

The records of the probate court [1] indicate that Mrs. Yount had, in fact, died in St. Louis on October 20. Thereafter, on

1. The entire file of the probate court concerning the estates of Essie Yount, incompetent, and Essie Yount, deceased, was received in evidence by stipulation.

October 26, Mrs. Hopkins filed a petition for additional allowance for herself and her attorneys, stating that she had arranged for the burial of her ward. Mrs. Hopkins also filed a notice of the death of her ward, stating that she herewith filed her final settlement and requested the appointment of "an Administrator * * * to whom she can give notice thereof."

The "final" settlement filed by the guardian showed debits in the amount of $5,226 and credits (disbursements) in the amount of $103.49, including a $35 bond premium. This settlement was filed on October 26, 1965. Two days later Mrs. Hopkins petitioned the probate court for letters of administration. That court refused the application, noting that Mrs. Hopkins was "involved in litigation in the Circuit Court of Iron County evolving from sale of real estate during her Guardianship." On November 23, 1965, the court appointed defendant Ogie Selinger as administrator of the estate, and fixed the amount of his bond at $5,000. On November 30, 1965, Mrs. Hopkins filed a "final report" as guardian, stating that after the payment of fees authorized by an order dated October 26, 1965, there remained a balance of $4,822.51 in the estate, which sum she had "this day paid to Ogie Selinger." The vouchers filed with this report show that Mrs. Hopkins paid $200 to herself for support and maintenance of her ward and $100 to her attorneys. Mr. Sellinger's receipt for the sum of $4,822.51 was also filed. On December 2, 1965, the probate court entered an order reciting that Mrs. Hopkins had filed the final receipts "of herself and her attorney," and also the receipt from Mr. Selinger, " * * * and the said Guardian and her seurty [sic] are hereby discharged and released." As indicated, the parties have stipulated that the whole of the probate file is before us; it is wholly barren of any indication that Mr. Selinger was given notice of the guardian's "final report" of November 30, 1965, or that he waived such notice, or that he appeared when the court received the final report and entered its order of December 2, 1965, purporting to discharge Mrs. Hopkins and her surety. Nevertheless, on December 2, defendant Selinger filed an administrator's bond in the probate court, with defendant Travelers Indemnity as surety, and thereupon entered into the performance of his duties as administrator. Defendant Selinger immediately filed several pleadings in the circuit court. A discussion of these pleadings is unnecessary, but it is worthy of note that he filed a petition to intervene in this case as a defendant, and that copies of the pleadings he prepared and filed in the circuit court were also filed in the probate court.

In addition to the action we are now reviewing, plaintiffs in this action filed a suit in the Circuit Court of Washington County, where the land is located, seeking to set aside the deed to Mr. Moses and to have the title quieted in them as purchasers at the guardian's sale. It is not clear from the record when this suit was filed, but defendant Selinger filed a motion to stay this cause pending determination of the action to quiet title, and joined as an intervening plaintiff in the action to quiet title in his capacity as administrator of the Estate of Essie Yount, Deceased. Defendant Selinger continued to administer the estate, paying out claims in the amount of $1,091.76 during the period from November 23, 1965, to January 2, 1967. In February 1968, the quiet title suit was decided adversely to the plaintiffs and defendant Selinger; it is stipulated here that in the quiet title action the Moses deed was declared valid, and the copy of the judgment filed with the probate court recites a finding " * * * that neither of the plaintiffs nor any of them have any right, title, estate or interest in or to the said premises or any part thereof."

After judgment was rendered in the quiet title action, plaintiffs, by leave of court, amended their petition in this action. This petition is laid in four counts. We are concerned here with only the first

three counts of this petition in which Mrs. Hopkins as guardian, Mr. Selinger as administrator, and Travelers Indemnity Co. as surety, were joined as defendants. In Count One, the petition alleges Mrs. Hopkins' appointment as guardian and her service in that capacity from May 15, 1965, to December 2 of that year; the listing of the property involved as an asset of the estate; that Mrs. Hopkins represented that her ward was "siezed [sic] of an indefeasible estate in fee" in the said property, and that she was authorized to transfer the property free of any encumbrance; that on September 11, 1965, Mrs. Hopkins delivered to the plaintiffs a guardian's deed in exchange for payment of the sum of $4,875 and $250 in cash to "Trainer Realty" as real estate commission; and that on September 20, 1965, plaintiffs, upon filing their deed for record, discovered that the Moses deed had been recorded on July 10, 1965. This count further alleges that plaintiffs made payment relying upon Mrs. Hopkins' representation that title to the property was good, and that they made demand for return of the money. The plaintiffs pray judgment in the sum of $5,125, together with interest at the rate of six per cent from and after September 11, 1965.

In Count Two of this petition, plaintiffs restate the substance of Count One and further allege defendant Selinger's appointment as administrator of Mrs. Yount's estate on November 23, 1965. Plaintiffs further aver that Mr. Selinger took over the assets of the estate with knowledge of all the transactions which had taken place during the guardianship, and particularly with knowledge of the pendency of this action; that despite such knowledge he made payments from the assets of the estate with knowledge that the title to those assets was in dispute; and that "such actions of said defendant [Selinger] were unlawful and illegal and in contravention and in derogation of the rights of plaintiffs." Plaintiffs in this count pray judgment against defendant Selinger as administrator in the sum of $5,125.

Count Three is directed to defendant Travelers Indemnity Co. In substance, this count avers Travelers' responsibility for the wrongful acts alleged on the part of the guardian and administrator and prays judgment for the amount prayed for in Counts One and Two. Count Four of the petition is not in issue here; the substance of the fourth count is that defendant Hopkins and her husband conspired to deceive and defraud plaintiffs by soliciting their purchase of the property.

The defendants filed a number of responsive and dilatory pleadings, but in the view we take of the appeal, it is unnecessary to digest and restate the substance of those pleadings. Eventually, a trial was had in the Circuit Court of Iron County, before the court sitting without the intervention of a jury. At the beginning of the trial, as noted, the entire file of the probate court was admitted in evidence by stipulation, and an additional stipulation of fact, the substance of which we have already recited, was also received. The record recites that all the parties appeared by counsel, and the court heard testimony from four witnesses.

Plaintiff Buford Gilliam identified himself, stating that on September 11, 1965, he had paid $5,125 for the property in question. He had paid the money to Mr. William Edgar, Sr., an attorney who then represented Mrs. Hopkins, and had received a deed in return. Mr. Gilliam had heard in July 1965 that the property was for sale, and he had discussed a purchase with Mrs. Yount and Mrs. Hopkins. Later, "about the middle" of August 1965, Mr. Gilliam made an offer of $4,000, but Mrs. Hopkins refused his offer. A week or so later, Mr. Gilliam "decided to offer a little more money," and he raised his offer to $5,000, asking Mrs. Hopkins "if she had legal right to sell the property, and she said she did." Mrs. Hopkins asked Mrs. Yount if the price was acceptable, and Mrs. Yount agreed. This was "around the first of September." Mr. Gilliam "got the deed" on September 11. He was familiar with

the property when he bought it, having "known it all [his] life." To Mr. Gilliam's knowledge no one but Mr. and Mrs. Yount had lived on the property for twenty years prior to his purchase. Nothing had been said about the Moses deed in the course of Mr. Gilliam's negotiations with Mrs. Hopkins, and Mrs. Hopkins had said nothing about the state of the title at the time the sale was consummated on September 11.

When he discovered that the Moses deed had been recorded prior to his guardian's deed, Mr. Gilliam told Mrs. Hopkins "the [guardian's] deed was no good." Mrs. Hopkins told him he " * * * would get a good deed or [his] money back." That was on Sunday, and on the following day Mr. Gilliam and his wife had gone with Mrs. Hopkins to see Mr. Edgar, who represented Mrs. Hopkins as guardian. Mr. Edgar had then said "he would bust the deed." Mr. Gilliam countered that he "wanted his money back," and Mr. Edgar had said, " * * * go over to the [probate] court and demand your money back." Mr. Gilliam and his wife then started home, accompanied by Mrs. Hopkins. Mrs. Hopkins is Mr. Moses' aunt, and while the plaintiffs and Mrs. Hopkins were in the car Mrs. Hopkins had said she "knew Donnie [Moses] had the deed, but she didn't think it was right for him to have it." About two weeks later, the plaintiffs went to the probate office but were unable to see the probate judge. Plaintiffs had not further discussed the sale with Mrs. Hopkins, nor had they ever been offered a refund of their purchase money.

On cross-examination on behalf of the guardian, Mr. Gilliam repeated that Mrs. Hopkins had said she knew about the Moses deed. Mr. Gilliam had not had any title search made by any attorney or abstract company before he undertook to buy the property, and he said that he had learned the property was for sale through a newspaper advertisement. On cross-examination on behalf of defendant Selinger, Mr. Gilliam testified that Mrs. Yount had been present at the time he had discussed buying the property, and that she wanted to sell the property. Mrs. Yount had appeared to be alert and aware of the nature of the transaction. He also stated in response to counsel's question that Mrs. Hopkins had seemed surprised that there was another deed on the property when he first talked to her about the Moses deed. Mrs. Gilliam also testified, but we need not repeat the substance of her testimony; for the most part, her narration of events was the same as Mr. Gilliam's.

Defendants had the evidence of Mr. William R. Edgar, Jr., an attorney of 32 years' experience. At the time in question, Mr. Edgar had been practicing with his father, who died before this trial took place. Mr. Edgar and his father owned an abstract company and had a considerable title practice. Mr. Edgar went to Washington County sometime in June 1965 in connection with other matters, and he investigated the state of the title to the Yount property. Mr. Edgar had had considerable difficulty obtaining information about the Yount property; he had been informed, or had heard, that at some past time an option to sell the property had been executed, but as he recalled the Washington County abstracter had either reported that the option was invalid or had expired. In any event, Mr. Edgar had concluded that the Yount property was unencumbered, although he did say that the information he obtained was not very complete or satisfactory. He concluded, finally, that Mrs. Yount owned the land and reported his conclusion to his father. Mr. Edgar made no title investigation after June 1965, and he was otherwise unfamiliar with the guardianship estate. He also said that although it was not unusual for the purchaser of land to ask for an abstract of title, it was unusual for the vendor to provide one upon a judicial sale.

Defendant Hopkins testified that Mrs. Yount became ill in February 1965, and thereafter lived with her, Mrs. Hopkins. She recalled listing the property involved on the guardian's inventory, and she re-

called executing the guardian's deed. According to Mrs. Hopkins, everything that she did as guardian was on the advice of counsel. Mrs. Hopkins remembered the plaintiffs having discussed the purchase of the property with her mother, perhaps in July 1965, but denied that she participated in the conversation. "A few days later"— she did not recall the exact date—Mr. Gilliam did discuss buying the farm with Mrs. Hopkins, and finally he offered to pay $5,000. Mrs. Hopkins agreed to accept $4,875 with Mr. Gilliam paying the real estate commission. Mrs. Hopkins testified that the title to the property was never discussed or even mentioned. She did state that she had authority to sell the land, as guardian, but Mr. Gilliam had not asked for an abstract. The fee paid Trainer Realty Company never came into the witness' possession. Mrs. Hopkins stated further that the first knowledge she had of the Moses deed was that which she acquired from Mr. Gilliam; she specifically denied knowing that her mother had executed the deed to Mr. Moses. She further denied having said that she knew Mr. Moses had the deed "but it wasn't right for him to have it," or having made any similar statement.

On cross-examination on behalf of the plaintiffs, Mrs. Hopkins said she had simply relied on Mr. Edgar's judgment; she had not discussed the state of the title with him but had simply "figured he knew what he was doing." When she received the purchase money she "taken it down and gave it to Mr. Edgar." She denied having promised plaintiffs that she would refund their money if the title was faulty. Mrs. Hopkins was further cross-examined by counsel for defendant Selinger, and by counsel for defendant Travelers Indemnity, but what we have digested is, in substance, her testimony as material here.

The case was taken under submission by the trial court on May 2, 1969. In September, plaintiffs were given leave to amend their petition to allege that Mr. Selinger took possession of the assets of the Yount estate with knowledge of the transaction completed by the guardian, and that he made payments from those assets in behalf of the estate knowing that the ownership of those assets was in dispute and that such actions were "unlawful and illegal and in derogation of the rights of plaintiffs." The petition was further amended to pray the imposition of a constructive trust upon the assets remaining in the hands of defendant Selinger as administrator. Finally, on February 6, 1970, the court entered judgment jointly against the defendants in the sum of $5,125, with interest from September 11, 1965, and further ordered that the funds remaining in the hands of defendant Selinger as administrator be impressed with a trust in favor of plaintiffs. It was further ordered that defendant Selinger pay all of the funds now in his hands as administrator into the registry of the court for payment to plaintiffs. Judgment on the first three counts of the petition was designated as final for purposes of this appeal.

As noted, the defendants have appealed separately. Between them, they have asserted eight very broad and general assignments of error, some overlapping and some made without citation of any authority. We have considered the entire record carefully, including the 64-page record of the probate court and the stipulation of fact which was filed prior to the commencement of the trial, but we shall not undertake to consider, discuss and correlate all the points, legal and factual, which have been raised indirectly or by suggestion; space will be conserved to the extent possible, and we shall confine ourselves to a consideration and discussion of those points essential and necessary to a proper disposition of the appeal. See Bloomfield Reorganized School Dist. No. R–14, Stoddard v. Stites, Mo., 336 S.W.2d 95, 97; Southwest Engineering Co. v. Reorganized School District R–9, Mo.App., 434 S.W.2d 743, 746. One point asserted in very general terms by defendant Selinger and adopted by his surety in its separate brief, is that plaintiffs wholly failed to plead or

prove any ground of recovery against them. The case was tried to the court sitting without a jury, but no findings of fact were requested and the court did not indicate the theory upon which it acted. Therefore, as the appellants tacitly recognize, unless other assigned errors appear, the judgment must be affirmed if it can be sustained on any reasonable theory consistent with the pleadings. Edgar v. Fitzpatrick, Mo., 377 S.W.2d 314, 318 [12]; Lossing v. Shull, 351 Mo. 342, 351, 173 S.W.2d 1, 5 [1]; Service Construction Co. v. Nichols, Mo.App., 378 S.W.2d 283, 290 [12].

Considering the whole record, and bearing in mind that conflicts in the evidence are primarily matters for resolution by the trial court, Wilson v. Watt, Mo., 327 S.W.2d 841, 850 [10]; Allison v. Dilsaver, Mo.App., 387 S.W.2d 206, 214 [12], the following factual findings are justified: On May 15, 1965, Mrs. Hopkins was appointed guardian of the person and estate of her mother. With her attorney's help, she made up an inventory and appraisement of the estate, including land which her ward had already deeded away. Finding that the land was the estate's only substantial asset, Mrs. Hopkins petitioned the probate court for authority to sell it to provide funds for her ward's support. She made no inquiry about the title to the property, but relied solely upon Mr. Edgar, who was advising her. In accordance with the probate court's order, Mrs. Hopkins executed a guardian's deed and received the sum of $4,875, which she deposited to her account as guardian. She received none of the money paid to the Trainer Realty Company. Several days after the purchase price had been paid, Mrs. Hopkins was informed by the plaintiffs that her ward had already executed and delivered a deed to the property involved to Mr. Moses. Whether or not she assured plaintiffs they would "get a good deed or [their] money back," the trial court could have found that plaintiffs demanded return of the purchase price and that Mrs. Hopkins refused either to refund the money plaintiffs had paid or to retain a sum sufficient to return the purchase money, should plaintiffs' claim prove to be just. Instead, Mrs. Hopkins continued to administer her ward's estate, paying out some $403.49 in charges and claims before she finally surrendered the balance in her hands, $4,822.51, to Mr. Selinger.

Mr. Selinger, having qualified as administrator of the Estate of Essie Yount, Deceased, and having executed a bond in the penal sum of $5,000, intervened in the quiet title suit as a party plaintiff. He nevertheless continued to administer the estate of Essie Yount, paying out claims and charges in the amount of $1,091.76 during the period from November 23, 1965, to January 2, 1967. The record further indicated, and the trial court could have found, that attorney's fees in the sum of $1,018.66 have been allowed as a claim in probate court. In short, the trial court could reasonably have found that Mrs. Hopkins, as guardian, and Mr. Selinger, as administrator, took the proceeds of the sale in possession as property belonging to the estates which they represented, and used those funds in the administration of those estates.

As for defendants' contention that such findings, in the circumstances of this case, would not justify a judgment against them in their representative capacities, it is generally true that a tort committed by a trustee, executor or administrator renders him as an individual, and not the estate, liable in damages. Barnett v. Schumacher, Mo., 453 S.W.2d 934, 936–937 [2, 3]; Richardson v. Palmer, 24 Mo.App. 480, 488–493. There are nevertheless exceptions to this general rule when the estate itself is benefited by the personal representative's tortious conduct. So it has been held in varying circumstances by our courts that when a personal representative takes property, actually owned by a third person, under the claim or belief that it is an asset of the estate and puts it (or its proceeds if it is converted into cash) into the estate, the owner can recover the prop-

erty or its value from the personal representative, or the surety on his official bond, after final determination that the property is not an asset of the estate, if the personal representative refuses to return the property or its value to the owner.[2]

Moreover, as noted in the *Gnekow* case, the owner of the converted property (or its proceeds) is not limited to a single remedy. If the personal representative still has the specific property, the owner may sue in replevin against the personal representative in his official capacity. State ex rel. and to Use of Gnekow v. United States Fidelity & Guaranty Co., supra, 349 Mo. at 535, 163 S.W.2d at 89; White v. McFarland, supra, 148 Mo.App. at 348, 128 S.W. at 25. If the personal representative has sold the property and has received and used the proceeds as part of the estate (as is the case here) the plaintiffs may be granted relief by decreeing payment out of the funds of the estate. State ex rel. and to Use of Gnekow v. United States Fidelity & Guaranty Co., supra, 349 Mo. at 535, 163 S.W.2d at 89; Silsby v. Wickersham, supra, 171 Mo.App. at 132, 155 S.W. at 1095 [2]. And, of course, as the *Gnekow* case directly holds, the personal representative's expenditure of funds rightfully belonging to another while ownership of the funds is being litigated is a breach of the personal representative's obligation to faithfully administer the estate, similar to waste, rendering both the personal representative and his surety liable, once the question of ownership has been decided. State ex rel. and to Use of Gnekow v. United States Fidelity & Guaranty Co., supra, 349 Mo. at 535–536, 163 S.W.2d at 90 [5–7]. Still other cases, such as Kerber v. Rowe, 348 Mo. 1125, 1130, 156 S.W.2d 925, 928 [2] [3], suggest,

if they do not directly hold, that plaintiffs are entitled to have a constructive trust imposed upon the property being wrongfully withheld by the personal representative. We need not prolong the discussion of this point; the authorities cited, in our opinion, show the lack of merit in defendants' contention that the relief granted was not warranted on any reasonable theory.

There is no more merit, in our view, in the very general contention advanced by defendant Selinger and his surety that the relief granted against them was wholly beyond the scope of the pleadings. Rule 55.54, V.A.M.R. [§ 509.500, RSMo 1969, V.A.M.S.] permits amendment of the pleadings to conform to the evidence, even after judgment, and in this case plaintiffs, by leave of court, amended their petition to allege that defendant Selinger received the assets of the guardianship estate with knowledge that they were being claimed by others, and thereafter knowingly paid charges and claims against the Estate of Essie Yount, Deceased, while ownership of the assets of that estate was being litigated. The proof presented—by stipulation—tended to show that such was the case, for the probate file shows that Mr. Selinger intervened not only in the quiet title action but in this case, almost as soon as he qualified as administrator, and the file indicates that he continued to administer the estate while the two suits were being litigated. In our opinion, plaintiffs, by their amendment after trial, brought defendants Selinger and his surety squarely within the rule announced in State ex rel. and to Use of Gnekow v. United States Fidelity & Guaranty Co., supra, 349 Mo. at 535–536, 163 S.W.2d at 90, that failure of a personal representative to hold the funds of the estate intact when litigation is still pending to determine its ownership is a breach of

---

2. State ex rel. Gnekow v. United States Fidelity & Guaranty Co., 349 Mo. 528, 534–535, 163 S.W.2d 86, 89–90 [1, 2] [3, 4]; Nye v. United States Fidelity & Guaranty Co., 225 Mo.App. 593, 595, 37 S.W.2d 988, 989 [1]; State ex rel.

Whitlow v. American Surety Co. of New York, 191 Mo.App. 191, 195, 177 S.W. 1074, 1075 [1]; Silsby v. Wickersham, 171 Mo.App. 128, 132, 155 S.W. 1094, 1095 [1] [2]; White v. McFarland, 148 Mo.App. 338, 348–349, 128 S.W. 23, 25.

the personal representative's obligation to faithfully administer the estate, similar to waste. As stated and briefed by appellants Selinger and his surety, the contention is without merit.

The guardian's briefed points on appeal are: (a) that her office became extinct for all purposes upon the death of her ward, which occurred before suit was filed; and (b) that the probate court's order of December 2, 1965, discharged her from all liability, and protected her from judgment here.

As previously noted, the ward, Mrs. Yount, died in St. Louis on October 20, 1965. This action was commenced on October 21, and a writ of summons was served on Mrs. Hopkins the same day. As further noted, Mrs. Hopkins filed two accounts in the nature of a "final" settlement; one such account was filed on October 26, and another on November 30, 1965, the last being simply styled a "final report." By an order dated December 2, 1965, the probate court ordered Mrs. Hopkins and her surety discharged, having refused, on November 23, to appoint Mrs. Hopkins administratrix because she was "involved in litigation * * * evolving from sale of real estate during her Guardianship."

▓▓▓ Considering first the guardian's contention that her guardianship became extinct for all purposes upon the death of her ward, we believe this is not quite literally true, nor do we think this court so held in State ex rel. Emmons v. Hollenbeck, Mo.App., 394 S.W.2d 82, and Trask v. Davis, Mo.App., 297 S.W.2d 792. It is true that after the death of the ward the guardian can no longer entertain nor make a claim on behalf of his ward, as fully noted and discussed in State ex rel. Emmons v. Hollenbeck, supra, 394 S.W.2d at 88–89 [6] [7]. As we shall presently see, the cause of action asserted in this case was not a claim or demand to be asserted in the probate court, but an action properly asserted against the guardian and her successor administrator. This case basically involves plaintiffs' claim that the guardian converted assets belonging to them to the use and benefit of her ward's estate, and while the conversion charged in Estate of Kauppi v. Bridges, Mo., 462 S.W.2d 694, was of a different sort, that case plainly shows that a guardian and his surety are not fully discharged and released from liability incurred by the guardian for tortious acts until the guardian files and the court approves a final settlement in the manner provided by statute. Estate of Kauppi v. Bridges, supra, 462 S.W.2d at 697–698 [1]. Neither the settlement filed October 26 nor that filed November 30 was made in compliance with the requirements of § 475.290, RSMo 1969, V.A.M.S., for as we have said, the record is wholly devoid of any indication that Mr. Selinger was given notice of the guardian's "final report," or that he waived such notice, or that he appeared when the court received the final report and entered its order of December 2, 1965. For a settlement to have the constructive force and effect of a final settlement, the specified statutory procedure must be followed. Estate of Kauppi v. Bridges, supra, 462 S.W.2d at 698; May v. May, 189 Mo. 485, 502, 88 S.W. 75, 79; State ex rel. Travelers Indemnity Co. v. Swink, Mo. App., 440 S.W.2d 152, 155 [2]. At best, the guardian's settlement had no greater force and effect than an annual settlement. State ex rel. Travelers Indemnity Co. v. Swink, supra, 440 S.W.2d at 155 [1, 2]. Moreover, the guardian's settlement, even if it could be given the force and effect of a final settlement, would not be adjudicative of the matters in litigation here. A final settlement in probate court adjudicates and is conclusive only as to those matters presented to and adjudicated by that court,[3] and the issue of ownership of

3. Bramell v. Adams, 146 Mo. 70, 87, 47 S.W. 931, 935 [4]; Nelson v. Barnett, 123 Mo. 564, 570–571, 27 S.W. 520, 521 [2]; Snorgrass v. Moore, 30 Mo.App. 232, 238–239 [1]; 3 Woerner, American Law of Administration, § 570, p. 1960.

the land sold to plaintiffs (and hence the ownership of the proceeds) was a matter which was not and indeed could not, in this instance, have been litigated in that court. We believe and hold that in this case Mrs. Hopkins was amenable to suit as guardian of the estate despite the death of her ward prior to its filing, and that the order of December 2, 1965, purporting to discharge the guardian was no bar to this action. The same considerations apply to the argument made by defendants Selinger and Travelers Indemnity that the action constitutes a collateral attack upon valid and binding orders issued after he qualified as administrator.

■ Another point vigorously asserted by defendant Selinger is that the plaintiffs' action is barred by limitation. He attempts to combine this point with the assertion that no valid claim was ever asserted against Mrs. Hopkins as guardian, but the relationship between the guardian and the administrator is merely that of codefendants, Mrs. Hopkins makes no assertion that the original petition stated no actionable claim against her as guardian, and defendant Selinger is in no position to assert error in the pleadings filed against his codefendant, Dean v. Young, Mo., 396 S.W. 2d 549, 558 [13]; State ex rel. Cunningham v. Haid, 328 Mo. 208, 212, 40 S.W.2d 1048, 1049–1050 [1, 2]; White v. Kuhnert, Mo.App., 207 S.W.2d 839, 841 [3], unless the error was in some way prejudicial to him, which is not demonstrated here.

The substance of this whole point, as we follow defendant Selinger's argument, is really that the plaintiffs' action was barred because it was a species of claim or demand against the estate, and therefore was governed by the provisions of §§ 473.360 and 473.367, RSMo 1969, V.A.M.S., but such is not the case. The object of this action was to recover assets from the guardian and the administrator on the ground that they had converted the proceeds of the sale to the use and benefit of the estate; plaintiffs were not suing to enforce a personal liability of the decedent or to establish a demand which existed against her, but to recover assets which were never properly part of the estate. The legal situation here is analogous to those cases in which the plaintiffs have sought to recover specific assets in the possession of the personal representative, and plaintiffs were not asserting a claim within the meaning of the non-claim statutes applicable to claims in the probate court. Strumberg v. Mercantile Trust Company, Mo., 367 S.W.2d 535, 538 [3–5]; Bramell v. Adams, supra, 146 Mo. at 84–85, 47 S.W. at 934 [3]; Nye v. United States Fidelity & Guaranty Co., supra, 225 Mo. App. at 598, 37 S.W.2d at 990 [5]; Snorgrass v. Moore, supra, 30 Mo.App. at 238–239 [2].

The surety asserts that it can be held responsible only if plaintiffs are entitled to judgment against either or both of the codefendants, citing cases which hold that the surety's liability is coterminous with that of the principal, e. g., State ex rel. and to use of Gieringer v. Kilgore, Mo. App., 238 S.W.2d 874, 875–876 [2] [3]. We agree with the general principle, but believe that plaintiffs here were entitled to judgment against both defendants. Intensive research has disclosed no case similar on the facts, that is, similar in involving the liability of the guardian, and admittedly the case law is in conflict,[4] but, to reiterate, in our view the substance of the action against both Mrs. Hopkins and Mr. Selinger was that they had taken in possession, and used as assets of the estates, funds belonging to a third person, with knowledge that those funds were being claimed by another. While the Gnekow case, supra, 349 Mo. at 536, 163 S.W.2d at 90, holds that final determination of the ownership of the assets is a prerequisite to recovery and limits its holding to those cases in which litigation to determine ownership is pending, still Mrs. Hopkins had knowledge, within a few days of the sale,

4. Annos., 127 A.L.R. 687 (1940); 104 A.L.R. 180 (1936); 44 A.L.R. 637 (1926).

that the property she had sold had already been conveyed to another, and that the plaintiffs claimed ownership of the amount they had paid as the purchase price. Mr. Selinger was aware, when he qualified, that ownership of the land (and therefore its proceeds) was in litigation; he joined in that litigation and became bound by the judgment. Neither defendant did anything to hold the funds intact while ownership of the land was being decided, thereby preventing damage to the plaintiffs and to the estates. We think the actions of both defendants constituted breaches of their obligations to faithfully administer the estates and render them and their surety liable. State ex rel. and to use of Gnekow v. United States Fidelity & Guaranty Co., supra, 349 Mo. at 535–536, 163 S.W.2d at 90 [5–7].[5]

■ The surety also maintains that any wrongful act on the part of Mrs. Hopkins occurred prior to the time she filed a bond as guardian, and therefore Travelers owes no duty to indemnify defendant Hopkins and thus none to plaintiffs. We cannot agree, although it is undoubtedly true that in the absence of an express agreement to the contrary the surety is not responsible for the acts of his principal occurring prior to the execution of the bond. In re Keisker's Estate, 350 Mo. 727, 733–734, 168 S.W.2d 96, 99. We believe, however, that the actionable wrong sued upon occurred after the bond became effective. The probate file shows that Mrs. Hopkins went quite some time—from May 15, 1965, to September 11, 1965—without executing any bond. On September 11, 1965, she executed a statutory bond in the sum of $5,000, and on this same day she received the purchase money. On September 20, it was discovered that the Moses deed had been filed, and within a week or so plaintiffs

made demand for the return of the purchase price. We regard the retention of the money, after notice of the recording of the Moses deed and after demand for restitution, as the guardian's breach of her obligation to faithfully administer the estate. The probate file, indeed, indicates that at the time Mrs. Hopkins filed her first settlement on October 26, 1965, she still had on hand funds sufficient ($5,122) to make restitution to plaintiffs, but that she made further disbursements. The surety's point, in our view, is without merit.

■ Finally, there is a question, indirectly raised, as to the amount in which judgment should have been entered. Recovery was allowed against both defendants and their surety, as noted, in the sum of $5,125, with interest from September 11, 1965. This includes the $250 paid as commission to a real estate salesman, which never went into nor became a part of the estate. The trial court further impressed the remaining assets of the estate with a trust and ordered defendant Selinger to pay over the funds in his hands as administrator in partial satisfaction of the judgment.

We think the judgment is excessive to the extent that it allows recovery of money —the real estate commission—which never became a part of either estate, and if either defendant is liable for that sum it is not in his or her representative capacity. The object of the action is to restore to plaintiffs the purchase money paid for land sold at a wholly invalid judicial sale, and thereafter converted to the use and benefit of the estate. As noted, it was entirely proper to allow recovery from the estate— and we do not know how much money remains on hand—but recovery against the defendants should be allowed only to the

5. See also, generally, De Valengin's Administrators v. Duffy, 39 U.S. (14 Peters) 282, 290–291, 10 L.Ed. 457, 460–461; Boshears v. Anderson, 140 Ark. 144, 215 S.W. 702 (sale of personalty); Minnesota Odd Fellows Home v. Pogue, 245 Minn. 539, 73 N.W.2d 615; Schmitt v. Jacques, 26 Tex.Civ.App. 125, 62 S.W. 956, 957 (sale of realty belonging to another).

extent that the judgment for plaintiffs remains unsatisfied after payment of the funds now in the hands of defendant Selinger. Judgment should then be entered in favor of plaintiffs and against the defendants and their surety jointly for the difference between the amount paid by plaintiffs for the real property, $4,875, with interest at six per cent per annum to the date of entry of the judgment, and the amount now remaining in the hands of defendant Selinger. The cause is remanded for the entry of such judgment in accordance with the views herein expressed, and is in all other respects affirmed.

TITUS, P. J., and STONE, J., concur.

## ON MOTIONS FOR REHEARNG AND ALTERNATIVE MOTION TO TRANSFER TO SUPREME COURT

PER CURIAM·:

Both defendant Hopkins and defendant Selinger have filed motions for rehearing; defendant Selinger has joined his motion for rehearing with an alternative motion for transfer to the Supreme Court, as authorized by Rule 84.05(a), V.A.M.R. One point made in common by both parties is that a joint judgment should not have been entered against them, but that separate judgments should be entered, if at all, against each party for that sum expended during the course of his or her administration. Defendant Hopkins claims she should be held to account for only the sum of $52.49, while defendant Selinger maintains he should be held to account for only the sum which he received, $4,822.51.

■ In our view of this case, the entry of separate judgments was not and would not be authorized. Although, as some authorities point out, the nature of a case of this kind is difficult to characterize, Anno., 44 A.L.R. at 657, the view of this court is that defendants' conduct in retaining possession of the proceeds of the sale as part of the estates constituted a species of conversion, that is, a failure to deliver personal property (here the proceeds of the sale) after demand for possession by the persons entitled thereto. See generally, 18 Am. Jur.2d Conversion, § 43, pp. 182–183. The language of the decisions upon which we based our principal opinion seems to us to support this conclusion, at least indirectly.[6] Conversion being a tort, we believe this action must be generally characterized as an action ex delicto for compensatory damages and that a joint judgment must be entered against both defendants Hopkins and Selinger, who were sued jointly. State ex rel. Hall v. Cook, Mo., 400 S.W.2d 39, 40 [2]; Electrolytic Chlorine Co. v. Wallace & Tierman Co., 328 Mo. 782, 791, 41 S.W. 2d 1049, 1052, 78 A.L.R. 930, 937.

■ Defendant Selinger further complains that affirmance of the judgment of the trial court permits a collateral attack upon orders of the probate court, which is of course true. We have before us, however, the whole record, not just the record of the probate court, and that record shows on its face (because of the judgment in the Circuit Court of Washington County) that the probate court's order of sale was wholly void because the real property in question was never part of either estate. In

6. State ex rel. and to Use of Gnekow v. United States Fidelity & Guaranty Co., supra, 349 Mo. at 536, 163 S.W.2d at 90, speaks of the general conflict of authority on estate and bond liability for *conversion* of property; in Nye v. United States Fidelity & Guaranty Co., supra, 225 Mo.App. at 595, 37 S.W.2d at 989 [1], the court held that an action in replevin or *conversion* would lie; in State ex rel. Whitlow v. American Surety Co. of New York, supra, 191 Mo.App. at 196, 177 S.W. at 1076, the court characterized the administrator's wrongful retention of partnership property as "his *conversion* thereof. * * * *"

other words, as was true in Linville v. Ripley, 347 Mo. 95, 100–101; 146 S.W.2d 581, 582–583 [1] [2–4] [5,6], one of the essentials necessary to give the probate court jurisdiction to administer the proceeds of the sale as part of the two estates is affirmatively shown upon the whole record to be lacking, and the objection that the present suit constitutes a collateral attack upon the probate court's judgments or orders is of no avail.

Defendant Selinger further argues that since the original petition against Mrs. Hopkins stated a cause of action for fraud it cannot fairly be said that he was apprised of the nature of plaintiffs' claim. He could not have known, counsel argues, that a suit against the estate was contemplated. In our view, the pleadings filed by defendant Selinger indicate that he was indeed aware of the true nature of plaintiffs' claim. In his motion to intervene as a party in the quiet title action in Washington County, defendant Selinger gave as a reason "[t]hat in the event that defendant [Moses] should prevail * * * *there is a distinct possibility* * * * *that the Estate of Essie Yount would be required to pay to the plaintiffs herein certain monies and assets of said estate.*" (Our emphasis.) The date of this particular pleading is not shown precisely, but it recites that a copy thereof was mailed to opposing counsel in December 1965, soon after defendant Selinger qualified as administrator. This motion, plus the allegations of the other pleadings filed as soon as Mr. Selinger qualified, convinces us that the trial court could reasonably have found that Mr. Selinger—or his counsel, at least—was aware that plaintiffs, in their action, claimed that the personal representatives involved were wrongfully detaining property belonging to plaintiffs as assets of the estate.

For the reasons indicated, the motions for rehearing and the alternative motion for transfer to the Supreme Court are denied.